ESTATE OF ERNEST G. HOWES, DECEASED, EARL JOHNSON, HAROLD T. DAVIS, AND JOHN D. MERRIAM, EXECUTORS, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55517, 55556, 59154, 59155. Filed July 11, 1958.

*Robert W. Meserve, Esq.*, and *William Shelmerdine, Jr., Esq.*, for the petitioners in Docket Nos. 55517, 59154, and 59155; *Harry J. Rudick, Esq.*, and *Mason G. Kassel, Esq.*, for the petitioner in Docket No. 55556.

*John M. Doukas, Esq., Manning K. Leiter, Esq.*, and *Geoffrey Lanning, Esq.*, for the respondent.

TIETJENS, *Judge:* These consolidated proceedings involve deficiencies and claimed overpayments of income tax for the taxable periods set forth below:

| Docket No. | Calendar year | Petitioner | Deficiency | Claimed overpayment |
|---|---|---|---|---|
| 55517 | 1947 | Estate of Ernest G. Howes, Deceased, et al | $1,845,936.20 | |
| 59154 | 1947 | Edith E. Boyer | 143,580.48 | |
| 59155 | 1947 | Everett W. Pervere | 263,977.94 | |
| 55556 | 1948 [1] | Howes Leather Company, Inc | 261,163.51 | $1,777,427.23 |
| | 1949 [1] | Howes Leather Company, Inc | 285,866.13 | 410,270.18 |
| | 1950 [1] | Howes Leather Company, Inc | 289,509.40 | 276,520.45 |
| | 1951 [1] | Howes Leather Company, Inc | 1,081,812.36 | |

[1] Fiscal period ended June 30

[1] Proceedings of the following petitioners are consolidated herewith: Howes Leather Company, Inc., Docket No. 55556; Edith E. Boyer, Docket No. 59154; and Everett W. Pervere, Docket No. 59155.

The issues are: (1) Whether the exchange by petitioners of their stock in an affiliated group of corporations for cash, a note and bonds of the corporate petitioner, into which the affiliated group was merged, constituted the sale of a capital asset, or was it lacking in substance so as to subject the cash received to taxation either as ordinary business income, or as a dividend, or as a distribution in the course of a section 112 (g) (1) (A) reorganization; (2) in the event the transaction is held not to constitute a sale, what were the earnings and profits of the affiliated group as of the date of the exchange; (3) whether the statute of limitations bars assessment and collection of the deficiency in Docket No. 55517; (4) whether the Howes Leather Company, Inc., was exempt from income tax during the taxable periods in issue under section 101 (6) of the 1939 Code as amended; and (5) whether the amounts claimed as deductions for interest on bonds issued by the corporate petitioner were deductible under section 23 (b) of the 1939 Code.

Other issues raised by the pleadings have been conceded.

Some of the facts were stipulated.

FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Ernest G. Howes (hereinafter referred to as the decedent) died October 7, 1951. The executors were duly qualified and appointed for his estate. During 1947, the decedent resided in Cohasset, Massachusetts, and filed his Federal income tax return for that year on January 15, 1948, on the cash basis with the former collector of internal revenue for the district of Massachusetts.

Edith E. Boyer (hereinafter referred to as Boyer) resided in Braintree, Massachusetts, during 1947, and filed her Federal income tax return for that year on the cash basis with the former collector of internal revenue for the district of Massachusetts.

Everett W. Pervere (hereinafter referred to as Pervere) resided in North Andover, Massachusetts, during 1947, and filed his Federal income tax return for that year on the cash basis with the former collector of internal revenue for the district of Massachusetts.

Howes Leather Company, Inc. (hereinafter referred to as the new company), was organized July 15, 1947, under the laws of the State of Delaware. Since August 12, 1947, it maintained its principal place of business at Boston, Massachusetts. It filed its Federal income tax returns for the taxable periods ended June 30, 1948, 1949, 1950, and 1951, with the former collector of internal revenue for the district of Massachusetts.

In 1895, decedent went into business as a leather broker. By 1905, he had been joined in the business by his four brothers. In 1914, the assets of the business were transferred to Howes Brothers Company (hereinafter referred to as Brothers), a Massachusetts corporation. In 1917, Howes Brothers Hide Company (hereinafter referred to as Hide) was incorporated under the laws of Maine. Long prior to August 12, 1947, Hide had become a personal holding company. From its inception, the business expanded from brokerage and jobbing operations to include the tanning and cutting of leather. The tanning and cutting operations were conducted by a group of corporations affiliated with, or subsidiary to, Brothers and Hide. Operating control was centered in Brothers, which functioned as a commission merchant in buying hides and selling the leather of the group. As of July 16, 1947, the group was composed of 11 corporations of which 6 were engaged in the tanning of leather, 3 in the cutting of leather, 1 in the manufacture of tanning extract, and 1 in research relating to tanning processes. These corporations and their places of business were as set forth below.

| Operation | Corporation | Place of Business |
|---|---|---|
| Tanneries | Michigan Tanning and Extract Co | Michigan. |
| | W. W. Mooney and Sons Corp | Indiana. |
| | Franklin Tanning Co | Massachusetts. |
| | Mount Jewett Tanning Co | Pennsylvania. |
| | West Hickory Tanning Co | Pennsylvania. |
| | Pocahontas Tanning Co | West Virginia. |
| Cutting Companies | Tanners Cut Sole Co | Maine. |
| | J. D. Neilson Co | Illinois. |
| | Stephenson & Osborne, Inc | Massachusetts. |
| Extract Manufacture | Gardner Extract Co | Virginia. |
| Research Company | Leather Institute, Inc | Pennsylvania. |

On July 16, 1947, decedent, his two surviving brothers, Henry S. and Samuel C. Howes, and their relatives owned a controlling interest in Brothers and Hide. Those corporations owned in excess of 50 per cent of the common stock of Michigan Tanning and Extract, W. W. Mooney and Sons, and Franklin Tanning. The stock of those three companies not owned by Hide or Brothers was owned by employees, retired employees or beneficiaries of deceased employees of one or more of the affiliated group. W. W. Mooney and Sons owned 98 per cent of Mount Jewett's common stock. Brothers owned a minority interest in the common stock of West Hickory Tanning and Pocahontas Tanning. The majority interests in those two corporations were owned by stockholders unrelated to the Howeses. Pocahontas Tanning owned all the outstanding common stock of Gardner Extract. The tanneries owned, in varying percentages, all of the common stock of Tanners Cut Sole, which owned all of the common stock of J. D. Neilson, Stephenson & Osborne, and Leather Institute.

For a number of years prior to July 16, 1947, the management of the group consisted of decedent, Samuel C. and Henry S. Howes, John Schanzle, Pervere, and Leo F. Ready. Schanzle and Ready had spent their entire careers with the group, and were not related to the Howeses. Pervere was decedent's stepson.

In 1945, decedent and his brothers, Henry S. and Samuel C. Howes, were elderly men. Most of their wealth was invested in the affiliated group, leaving them with insufficient resources with which to meet anticipated estate taxes. Numerous conferences were held with their attorney, accountant, and representatives of the First Boston Corporation to devise ways and means of diversifying the family investment. In 1946, as a result of those conferences, the Howeses decided to sell all of their stock in the affiliated group. First Boston was instructed to find a purchaser for that stock.

In April 1947, Howard P. Richardson of First Boston contacted John Gerdes, an alumnus and General Counsel of New York University, informing him of the Howeses' wish to sell their interest in the affiliated group. Richardson suggested the sale might proceed on a basis which would enable Gerdes to acquire that stock for the benefit of the University. On April 25, Gerdes, Richardson, and counsel for the Howeses met in New York to discuss the matter further. Thereafter, during May, June, and July of 1947, further conferences were held. Gerdes explained that he represented an alumni group of New York University; that his purpose in purchasing the affiliated group would be to benefit the University; that should the acquisition be made, it was hoped the University would have the benefit of the earnings of the enterprise exempt from Federal taxation. Gerdes stated the ultimate purchase price would have to be reasonable without regard to any such exemption; that payment thereof would have to extend over a number of years; that all the stock of the affiliated group would have to be available for purchase; and that, since the purchaser was in no position to supply the required technical management, the management would have to agree to sign long-term contracts to remain as employees. He further acquainted the Howeses with the tax-exempt status of the Ramsey Corporation of St. Louis, Missouri, which had been similarly organized for the benefit of the University.

In the latter part of May, negotiations temporarily halted due to differences as to price, terms of payment, and inability to deliver all the stock of the affiliated group. First, it developed that all of the stock of the Pocahontas Tanning Company could not be acquired due to the illness of its president and substantial stockholder. Secondly, Gerdes insisted on a price based upon the market value of the group's assets or upon its earnings record plus its asset value, whichever was

lower, while the Howeses insisted that the price be measured solely by the market value of the assets. Moreover, since a substantial portion of the purchase price would be payable over a number of years, the Howeses were concerned over the protection to be afforded their position as creditors. On June 4, negotiations were reopened, and suggestions made for a resolution of the differences. Thereafter, Henry S. Howes, Pervere, and others visited the Ramsey plant in St. Louis to observe its operations.

By late June of 1947, certain understandings, subject to final agreement, had been reached. Gerdes and his associates were to form a corporation under Delaware law for the benefit of the University. To give additional security to the bondholders, its charter was to provide for three classes of directors; one to be elected by stockholders; one to be elected by bondholders; and one, consisting of three members, to be elected one-third by the stockholders, one-third by the bondholders, and one-third by joint action. Any stockholders of the affiliated group who desired were to agree to sell all of their stock in the affiliated group to the new corporation. That corporation, however, was not to be obliged to purchase unless the individual holders of all of the stock of the group, except Pocahontas, agreed to sell. The price of the stock was to equal the market value of the assets of the affiliated group attributable to such stock, less liabilities, but not to exceed $30,300,000. Market value of the assets was to be based upon an appraisal of plants and equipment; goodwill of $500,000; inventory valued at market as of June 30, 1947; and the value agreed upon by Gerdes and Schanzle for the remaining assets. The purchase price was to be paid: 20 per cent by closing, 15 per cent during 1948, and the balance to be evidenced by first mortgage bonds, payable over a term of years, bearing interest at the rate of 3½ per cent. The purchaser was to be protected from unknown liabilities by a deposit in escrow of a portion of those bonds. Thereafter the parties concerned themselves with the drafting of an agreement to embody those understandings. Matters relating to the organization of the new company were left to the purchaser, except that the sellers concerned themselves with those portions of its charter and bylaws affecting their position as security holders. These latter provisions, which granted certain voting rights to the bondholders, were inserted in the agreement at the insistence of the Howeses for the purpose of securing the purchase price.

During late June and early July 1947, conferences were held with the First National Bank of Boston, to negotiate a loan for the new corporation, to enable the latter to meet the obligations which were to be incurred upon the purchase of the stock of the affiliated group. As a result, a loan of $6,200,000 was approved, repayable within a

few months. It was understood that two-thirds of the loan would remain on deposit with the bank.

On July 15, 1947, Howes Leather Company, Inc., was organized by Gerdes and his associates. Its authorized capital stock was $1,000, divided into 10 shares. It was authorized to issue $30,000,000 of first mortgage 20-year bonds bearing interest at the rate of 3½ per cent per annum. Its charter provided that it was organized exclusively for charitable or educational purposes; that it was incorporated solely for the benefit of New York University; that no part of its income or property could inure to the private benefit of any stockholder, director, or officer; that it was not to engage in propaganda or otherwise attempt to influence legislation; that it was to distribute to New York University such part of its property and net income as its directors should determine; that, in the event of liquidation, its assets, after satisfaction of creditors, were to be distributed to New York University; and that its certificate of incorporation could be amended by a majority of its stock and bond holders, provided such amendment should not divert any of its income or property, after satisfaction of creditors, to any other than New York University. It had broad powers to engage in business and to acquire and hold property. It had three classes of directors. The class A and one-third of the class C directors were to be elected by the stockholders; the class B and one-third of the class C directors were to be elected by the bondholders; the remaining one-third of the class C directors were to be elected by a majority of the stockholders together with a majority of the bondholders. A majority of the class A and class B directors was necessary to constitute a quorum. Shareholders were to elect the corporate officers.

Excluding Pocahontas Tanning, there were 24 individual stockholders of the affiliated group. On July 16, 1947, 17 of those shareholders, including decedent, Boyer, and Pervere, met in Boston with Gerdes, counsel for the Howeses, and a representative of First Boston. Terms of the agreement were explained. The stockholders present then signed it as sellers, and Gerdes signed on behalf of the new company as the purchaser. The agreement embodied the understandings theretofore reached. By July 23, all the shareholders of the affiliated group, excluding Pocahontas, other than the corporations themselves, had signed that agreement.

From the outset, Gerdes hoped to accomplish the transfer of assets from the affiliated group to the new company through the means of statutory merger. However, it was not until after July 23, 1947, that he was satisfied such a transaction could be effected under the laws of the various jurisdictions within which the new company would operate.

On August 12, 1947, pursuant to the agreement the following occurred. The new company received a $6,200,000 loan from the First National Bank of Boston. The sellers delivered to the new company their stock certificates together with the resignations of the officers and directors of the affiliated group except Pocahontas. New share certificates for the stock of the affiliated group were issued to the new company. The new company caused its nominees to be elected officers and directors of the corporations of the affiliated group. An indenture of trust and mortgage was executed by the new company to Old Colony Trust Company, Boston, to secure its authorized $30,000,000 principal amount of first mortgage 20-year bonds, the property covered being the stock and property of the affiliated group then or thereafter acquired by the new company, with certain exceptions. The new company paid $6,042,497.52 in cash to Old Colony for the benefit of the sellers, and delivered to Old Colony its promissory note payable in the amount of $4,531,873.14, due January 15, 1948, to be collected and paid over to the sellers as provided in the agreement, and further delivered to Old Colony a single first mortgage 20-year bond in the amount of $19,638,116.94 representing the balance of the tentative purchase price of $30,212,487.60. Old Colony then issued checks to the sellers for the amount due each of them. Pursuant to the agreement, the respective interests of the sellers in the bond and note were to be determined after an audit of the assets and liabilities of the various corporations in the affiliated group. Thereafter, Brothers, Hide, and the tanneries, except Pocahontas, were merged into the new company. No change was effected in the capital structure of the new company as a result of that merger. Decedent, Henry S. and Samuel C. Howes, Pervere, Schanzle, and Ready signed 20-year employment contracts with the new company at salaries which are stipulated to be reasonable. They were then elected class B directors of the new company. The six class A directors ultimately selected were all business and professional men interested in New York University. Gerdes was selected as one of the three class C directors, representing New York University, Arthur·E. Whittemore was selected as the class C representative of the bondholders, and Joseph P. Spang, Jr., who had no prior connection with any of the parties involved, was selected as the third class C director.

Following their election as class B directors, decedent, Henry S. and Samuel C. Howes, Pervere, and Ready were elected vice presidents of the new company. The other officers selected were Dudley L. Miller, president; Gerdes, treasurer; and Winthrop A. Short, secretary.

On July 10, 1947, the president of Pocahontas died. During the latter part of August and early part of September 1947, negotiations

took place between the new company and a majority of the Pocahontas shareholders looking toward the acquisition of the latter's stock. The Pocahontas shareholders agreed to a sale of their stock for bonds and short-term notes, and on September 19, 1947, Pocahontas was merged into the new company.

On October 31, 1947, the cutting companies were formally merged into the new company. The new company continued to hold the stock of Gardner Extract Co., acquired on the Pocahontas merger, and the stock of Leather Institute, Inc., acquired on the merger of the cutting companies.

On October 15, 1947, the shareholders of the new company entered into a voting trust agreement for the benefit of New York University. The purpose of that trust was to provide against possible inconvenience in the event of a stockholder's death.

The final authority with respect to the conduct of the new company's business rested in its board of directors, scheduled to meet four times a year and specially when needed. A committee on operations was provided for to act in the interim. That committee was scheduled to meet monthly, and specially when required. As first organized it consisted of decedent, Henry S. and Samuel C. Howes, Pervere, Schanzle, Ready, and Gerdes. Among other things, it was authorized to manage the manufacturing and selling operations of the new company. The first meeting of that committee was held on October 23, 1947, at which time it was resolved that any action approved by any four members of the committee should constitute action by the committee.

The bonds issued pursuant to the July 16 agreement and pursuant to the Pocahontas merger, were identical in form and substance. They matured on August 12, 1967, bore interest at $3\frac{1}{2}$ per cent per annum, and were secured by a mortgage of the new company's fixed assets, the stocks of the affiliated group transferred to the new company on August 12, 1947, and by its trade-marks and trade names. In the event of default in principal or interest, payment was to be accelerated, and the property subject to the mortgage seized. The bonds were prior to all other claims against the mortgaged property, and with respect to other property, were on a parity with all other creditor claims. It was provided that 40 per cent of consolidated net profits was to be annually applied to a sinking fund for their retirement. Sinking fund payments in the following amounts were made on the dates indicated:

| Year ending June 30 | Date of payment | Amount |
|---|---|---|
| 1948 | Aug. 12, 1949 | $987, 364. 50 |
| 1949 | Aug. 12, 1950 | 172, 485. 92 |
| 1950 | Aug. 12, 1951 | 60, 063. 36 |
| 1951 | Aug. 12, 1952 | 233, 069. 46 |

The balance of bonds outstanding as of August 12, 1952, was $21,207,-077.01. No principal payments for years subsequent to 1951 have been made. All payments of interest have been made when due.

On August 12, 1952, Henry S. Howes sold approximately $1,500,000 in face amount of those bonds at 30 per cent of their face value. Since the new company had determined not to purchase any of its bonds on the open market, it did not participate in that transaction.

The new company has made distributions to New York University or its affiliates in the following amounts:

| Date | Amount |
| --- | --- |
| June 28, 1948 | $200,000 |
| June 27, 1949 | 100,000 |
| June 26, 1950 | 50,000 |
| June 28, 1951 | 50,000 |
| Total | 400,000 |

No distributions have been made since 1951. On June 17, 1948, the directors of the new company voted to pay a further amount of $700,000 to the University should the new company be held exempt from tax for its taxable year ended June 30, 1948.

In 1947, the affiliated group was a substantial factor in the production of sole leather in the United States. For the 10-year period immediately preceding July 16, 1947, it had produced on the average of 15 to 20 per cent of all the sole leather produced in this country. It had built up a fine reputation for its product. Its organization was recognized throughout the industry as energetic and resourceful. In addition to its top management, it had a large group of younger executives with recognized ability to carry on the management of the enterprise. Its consolidated sales, after exclusion of intercompany sales, and its consolidated profits, before and after renegotiation and Federal taxes, for the years 1937 through 1946, were as follows:

| Year | Sales | Profits before renegotiation and taxes | Profits after renegotiation and taxes |
| --- | --- | --- | --- |
| 1937 | $15,281,448.95 | $1,024,310.45 | $774,252.57 |
| 1938 | 12,402,937.09 | 920,927.76 | 756,298.94 |
| 1939 | 13,012,364.13 | 1,054,876.82 | 848,455.94 |
| 1940 | 13,972,852.84 | 876,699.73 | 648,168.16 |
| 1941 | 26,382,360.97 | 3,747,019.35 | 1,793,693.13 |
| 1942 | 28,396,846.72 | 6,275,249.47 | 1,665,744.79 |
| 1943 | 23,724,002.45 | 3,829,848.57 | 1,285,436.02 |
| 1944 | 25,458,606.58 | 3,559,055.88 | 1,188,297.64 |
| 1945 | 24,160,759.85 | 2,418,897.43 | 1,006,217.88 |
| 1946 | 41,243,572.80 | 11,584,457.91 | 7,161,797.29 |

Set forth below are the undistributed earnings of each of the corporations in the affiliated group accumulated since February 28, 1913, as of August 12, 1947.

| Corporation | Undistributed earnings and profits | Corporation | Undistributed earnings and profits |
|---|---|---|---|
| Howes Brothers Co | $3,013,708.58 | Franklin Tanning Co | $2,336,655.18 |
| Howes Brothers Hide Co | (171,988.29) | Michigan Tanning and Extract Co | 2,989,331.99 |
| West Hickory Tanning Co | 1,005,439.62 | Tanner's Cut Sole Co | 1,868,517.60 |
| | | J. D. Neilson Co | 240,153.36 |
| Pocahontas Tanning Co | 1,310,346.94 | Stephenson & Osborne, Inc | 278,976.88 |
| W. W. Mooney and Sons Corp | 1,565,523.73 | Gardner Extract Co | 23,606.42 |
| | | Leather Institute, Inc | (¹) |
| Mount Jewett Tanning Co | 1,326,372.85 | | |

¹ None.

In accordance with the agreement, an audit report was prepared based on the balance sheets of the affiliated group as of June 30, 1947. Set forth below is a summary of the net worth of the group disclosed in that report.

ASSETS

| | |
|---|---|
| Cash ¹ | $13,484,332.47 |
| Receivables | 3,221,210.92 |
| Inventories | 15,407,348.36 |
| Investments | 3,920,590.61 |
| Real estate and equipment | 8,106,249.93 |
| Goodwill | 500,000.00 |
| Deferred charges | 194,074.43 |
| Other assets | 1,500.00 |
| **Total assets** | 44,835,306.72 |

LIABILITIES AND NET WORTH

| | |
|---|---|
| Payables | $2,819,165.81 |
| Taxes | 4,965,486.49 |
| Accrued liabilities | 322,084.58 |
| Reserve for retirement of preferred stock | 411,800.00 |
| **Total liabilities** | 8,518,536.88 |
| Net worth ¹ | 36,316,769.84 |

¹ Cash and net worth adjusted to reflect $87,512.40 expended on August 6, 1947, to retire 120 shares of common stock of Hide.

That report was not submitted until November 24, 1947. Prior to audit, all trade accounts receivable, representing some $2,428,585.46, had been collected. Inventory was valued at market as of June 30, 1947, based on a physical count. The real estate and equipment values were principally based upon reports of the American Appraisal Company which had physically inspected the properties of the group in 1942 and 1943. Those appraisals had been adjusted for additions and replacements occurring in later years, which, except for Pocahontas and West Hickory, were determined from company records.

Additions and replacements of those two companies were verified by inspection.

For each of the years 1931 through 1941, the percentage of shoes made with leather soles to the total shoe production in this country exceeded 73 per cent. During the period 1942 through 1945, wartime needs brought about a shortage of leather for civilian use. That shortage was partially alleviated through the use of substitutes, which proved unsatisfactory. In 1946, when leather once more became plentiful, it displaced substitutes and temporarily regained its prewar prominence in the civilian market.

Neolite, a substitute, was first marketed in November 1944. By 1946 its production had substantially increased. Subsequent to 1948, advances in the field of substitutes had had a serious effect on the sole leather industry. Set forth below are the annual percentages of shoes made with leather soles to the total shoes produced in this country for the years 1949 through 1956:

| Year | Percentage | Year | Percentage |
|---|---|---|---|
| 1949 | 56.5 | 1953 | 40.3 |
| 1950 | 51.3 | 1954 | 38.0 |
| 1951 | 44.5 | 1955 | 37.4 |
| 1952 | 41.2 | 1956 | 35.6 |

During that period, a number of sole leather firms went out of business. The influence of substitutes on upper leather, which is used in the sides and tops of shoes was negligible. In order to counteract the inroads suffered by virtue of the increased use of substitutes, the new company, during 1949 and later years, broadened its scope of activities to include the production of upper leather, acquiring two upper leather plants at a cost of between two and three million dollars.

The aggregate purchase price contained in the agreement was $30,212,487.60, exclusive of the stock of Pocahontas. If that stock had been included the price would have been $34,866,872.24. In arriving at those amounts Gerdes analyzed the consolidated balance sheets of the affiliated group for a 10-year period prior to 1947 in the light of the history of the industry, the prospective earning capacity of the group, and the estimated value of its assets. He estimated that cash and inventory to the extent of some $12,250,000 could be withdrawn from the enterprise without affecting its earning capacity.

On schedules attached to his 1947 return, decedent set forth that he had sold his stock for a contract price of $7,435,506.24, that his basis for that stock was $892,763.78, that costs of sale were $74,647.77, and that he realized a net gain of $6,468,094.69. Electing to report the sale on the installment basis he returned $1,289,444.69 of the $1,482,249.98 received in that year as an installment payment, applying the alternative tax rate.

On their 1947 returns Boyer and Pervere reported the exchange of their stock in the affiliated group as a sale, and the gain attributable thereto as a long-term capital gain. They reported the cash actually received during 1947 on the installment basis.

Respondent determined that the individual petitioners had exchanged their stock in the affiliated group in a partially nontaxable reorganization, and that the cash and notes which they received represented a taxable dividend under section 112 (c) (2). By amended answer he contends that the cash and notes received constituted gross income taxable at ordinary income rates or, in the alternative, taxable dividends under section 115 (a).

The new company filed a claim for exemption under section 101 (6) of the Internal Revenue Code of 1939 for the taxable periods ending June 30, 1948, 1949, 1950, and 1951. On its returns for those periods it claimed deductions for interest accrued on its bonds.

Respondent determined the new company was not exempt from Federal income tax during the years here in issue, and further determined that the amounts deducted as interest constituted dividends on capital stock and hence were nondeductible.

The decedent's return for 1947 was timely filed. The deficiency notice with respect thereto was mailed to his executors on September 20, 1954. His executors executed waivers extending the time for assessment and collection of that deficiency to June 30, 1955, only if there had been an omission by decedent from gross income of an amount properly includible therein in excess of 25 per cent of the amount of gross income which was stated on his return.

OPINION.

Simply stated the issue is whether the exchange of the stock of the affiliated group for cash, a note and bonds of the new company constituted a sale. Respondent maintains that it did not. In support of his position he argues three alternatives.

First, respondent contends the amounts received during 1947 by the individual petitioners represented gain from the operation of the new company taxable under section 22 (a), and not as proceeds of a sale. That is so he maintains because the alleged sellers retained such control of the business that the existence of a sale was totally negated. He argues that the bonds were in fact the equivalent of preferred stock issued solely to enable the withdrawal of surplus and earnings as capital gains, and further argues that the tax-exempt status of the new company was claimed merely to increase those earnings and profits.

Respondent's second argument is that the entire transaction should be disregarded as lacking in bona fides, in the light of the control

retained by the sellers, the payment of what he maintains was an inflated sales price, the tax avoidance motives giving rise to the entire transaction, and what he terms was the diversion of charitable funds to private interests.

His third argument is that the individual petitioners, pursuant to an agreed-upon plan within the meaning of section 112 (b) (3),[2] exchanged their stock in the affiliated group for what in reality was preferred stock, rather than bonds, a note and cash of the new company, in the course of a reorganization within the purview of section 112 (g) (1) (A),[3] and therefore that the cash received during 1947 represented a distribution of earnings and profits taxable as a dividend pursuant to section 112 (c) (1) and (2).[4]

Correlative to those arguments, respondent makes two further contentions. First, he argues that the new company was not exempt from tax under section 101 (6) [5] of the 1939 Code and section 302 (d) of the Revenue Act of 1950 as amended [6] for its fiscal years ending

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

  (b) EXCHANGES SOLELY IN KIND.—

    \*      \*      \*      \*      \*      \*      \*

    (3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[3] (g) DEFINITION OF REORGANIZATION.—\* \* \*

    (1) The term "reorganization" means (A) a statutory merger or consolidation \* \* \*

[4] (c) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—

    (1) If an exchange would be within the provisions of subsection (b)(1), (2), (3), or (5), or within the provisions of subsection (1), of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph or by subsection (1) to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

    (2) If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property.

[5] SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.

  The following organizations shall be exempt from taxation under this chapter—

    \*      \*      \*      \*      \*      \*      \*

    (6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes \* \* \* no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

[6] SEC. 302. EXEMPTION OF CERTAIN ORGANIZATIONS FOR PAST YEARS.

  (d) PROFITS INURING TO THE BENEFIT OF CERTAIN EDUCATIONAL ORGANIZATIONS OR HOSPITALS.—For any taxable year beginning prior to January 1, 1951, an organization operated for the primary purpose of carrying on a trade or business for profit, no part of the net earnings of which inures to the benefit of any private shareholder or individual and all of the net earnings of which inure to the benefit of an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly organized body of pupils or students in attendance at the place where its educational activities are regularly carried on \* \* \* shall not be denied exemption from taxation under section 101 of the Internal Revenue Code on the ground that it is carrying on a trade or business for profit.

June 30, 1948 to 1951, inclusive, because its earnings inured to the benefit of private individuals, (the selling stockholders). His second contention is that the payments of interest made by the new company on its bonds were in fact dividend payments and hence not deductible under section 23 (b).

Substance rather than form governs the tax effect of transactions such as this. Should a review of the record warrant the conclusion that the instant series of events was nothing more than a sham, then those events (the form in which the transaction was cast) must be ignored for tax purposes. *Higgins* v. *Smith*, 308 U. S. 473 (1940); *Gregory* v. *Helvering*, 293 U. S. 465 (1935). On the other hand, should we conclude that a very real transaction occurred, we must then decide whether petitioners' characterization thereof as a purchase and sale accords with substantial economic reality. *Haas* v. *Commissioner*, 248 F. 2d 487 (C. A. 2, 1957); *Gilbert* v. *Commissioner*, 248 F. 2d 399 (C. A. 2, 1957).

We are convinced that the transaction involved herein was bona fide. Advanced in years, and faced with substantial death taxes, the Howeses found it necessary to dispose of their stockholdings in the affiliated group. A purchaser was located who saw an opportunity to provide additional funds for New York University through the acquisition of a well-established business with substantial earnings. Utilizing a basic form which had proven successful in similar ventures, the parties negotiated the terms of a purchase and sale. Provisions were made for valuation of the worth of the group, for payment of the purchase price, and for the subsequent conduct of the business. The purchaser was primarily interested in the right to extend payment of the purchase price over a term of years. On the other hand, the sellers were concerned mainly with adequate safeguards to insure ultimate collection of the purchase price. A substantial loan was negotiated by the new company to enable it to meet the obligations it would be forced to assume upon closing. Upon a prearranged day, title to all the available stock of a multi-million dollar leather empire passed from the hands of 24 individuals into the hands of the new company in exchange for cash, a note, and long-term bonds. We are unable to conclude, as respondent would have us, that these facts constitute a sham which must be ignored for the purposes of arriving at the tax consequences of the instant exchange. On the contrary, we believe a very real transaction took place in the utmost good faith, the effects of which must be discerned by analyzing its component steps, rather than by ignoring them.

Nor are we prepared to say that the purchase price was unreasonable. As might be expected, both sides have marshalled for our consideration the evidence most favorable to their own approach.

While we cannot say respondent's position is completely without merit, we do not feel justified on this record to substitute our judgment for that of the contracting parties. Nothing would be gained by a discussion of the evidence leading us to that conclusion. Suffice it to say, after a careful consideration of record, including but not limited to the net worth of the group as of June 30, 1947, its earnings record, its position in the industry, and the provision for extended payment, we are satisfied that the total contract price of $30,212,-487.60, increased to $34,866,872.24 when the Pocahontas acquisition is considered, was fair and just, and was arrived at through arm's-length dealings between the parties.

We are equally convinced that petitioners' characterization of the instant series of events as a purchase and sale is in accord with substantial economic reality. In our judgment, the parties fully intended that the sellers sell, and that the purchaser buy, the stock of the affiliated group. Whether the debentures issued pursuant to the agreement represented indebtedness or equity capital is, as we have often said, a question of fact. We note that this is not the familiar case of thin capitalization where both stockholder and bondholder are one and the same, nor is it the case of the organizers of an enterprise who have designated as loans the major portion of the funds expended in getting the business underway. Rather we are concerned with the attempts of the owners and founders of a substantial enterprise to sell it in a manner most advantageous to themselves and their intended purchaser. For the most part they had devoted their lives to the enterprise, and were fully aware and confident of its success. As of the date of the exchange, they had no reason to anticipate any immediate diminution in its operations. This record does not support the conclusion that the leather industry, as early as 1947, was cognizant of the highly competitive nature of substitutes, or could have foreseen at that time the inroads the latter would make in the market. Since the sellers were dealing with a purchaser who was in no position to effect an outright payment of the purchase price, it was decided to utilize the profits of the business to make the agreed-upon payments, and a bond issue was devised to accomplish that end. That the parties did not seek private financing is of no concern to us. To secure the ultimate payment of the purchase price, through the continued successful operation of the business, the sellers took advantage of the provisions of Delaware law granting bondholders limited voting rights. Instruments were then prepared bearing a fixed maturity date, a fixed rate of interest, granting their holders a preferred position over stockholders and creditors with respect to the mortgaged property, and providing for acceleration in the event of default. After a careful consideration of these and other pertinent

facts of record, we are of the opinion that the bonds involved herein were true evidences of indebtedness and did not represent equity invested capital. *John Kelley Co.* v. *Commissioner*, 326 U. S. 521 (1946).

Respondent contends the voting rights granted the bondholders are indicative of a proprietary interest. As we have noted, those rights were obtained to serve as additional security for the payment of the purchase price, and not to reserve for the sellers a proprietary interest in the business. We are therefore of the opinion that they did not change the character of the bonds from evidences of indebtedness to evidences of equity capital. *Helvering* v. *Richmond, F. & P. R. Co.*, 90 F. 2d 971 (C. A. 4, 1937); *W. H. Truschel*, 29 T. C. 433 (1957), (involving similar bonds of the new company). As a result of the exchange, the individual petitioners ceased to be the owners of the business and were interested in it solely as secured creditors.

We must also reject respondent's theory that the instant transaction was a statutory reorganization. Inherent in the concept of "reorganization" is that there is a real continuity of interest in the owners of the old corporation and the owners of the new. *LeTulle* v. *Scofield*, 308 U. S. 415 (1940); *Roebling* v. *Commissioner*, 143 F. 2d 810 (C. A. 3, 1944), affirming a Memorandum Opinion of this Court dated June 30, 1943, certiorari denied 323 U. S. 773 (1944); *Cortland Specialty Co.* v. *Commissioner*, 60 F. 2d 937 (C. A. 2, 1932). Creditors are not owners, and when petitioners changed their status from stockholders to creditors, the continuity of ownership interest was broken. From that point forward the business was owned by the new company for the benefit of New York University. There was, therefore, no statutory reorganization within the meaning of section 112 (g) (1) (A) of the Code, but only the sale of a capital asset.

These conclusions make it unnecessary for us to consider whether respondent's determination of the amount of "dividends" received upon the transaction was correct. Neither do we reach the question as to whether assessment and collection in Docket No. 55517 is barred by the applicable statute of limitations.

The next question for consideration is whether the corporate petitioner was exempt from tax for each of its fiscal years here in issue under section 101 (6) of the 1939 Code and section 302 (d) of the Revenue Act of 1950 as amended. Respondent maintains it was not.

Respondent agrees the new company has not engaged in the carrying on of propaganda or otherwise attempted to influence legislation, and that New York University is an educational institution of the character contemplated by the statute. However, he argues the new company was not organized exclusively for educational purposes, but

rather as a device to distribute earnings and profits of the business to the old stockholders at capital gain rates. He further submits that when both stockholders and creditors are welded together in the management of a corporation through its charter, it cannot be said that that corporation is organized exclusively for the benefit of either. Moreover, he contends the earnings and profits of the new company inured to the benefit of the former stockholders of the affiliated group through dividends received in the form of interest, principal, and an inflated sales price.

The charter of the new company expressly provided that it was organized solely for the benefit of New York University. Further, as we have noted above, the instant transaction was in all respects what it purported to be. Therefore we reject respondent's contention that the new company was organized to syphon off earnings and profits under the guise of capital gains.

No part of the net earnings of the new company inured to the benefit of any of the sellers. Since the bonds represented true evidences of indebtedness, the investment was sound in the circumstances existing at the time it was made, and the purchase price was reasonable, the payment of part of the corporate petitioner's income to the sellers was nothing other than the consideration for the purchase of their stock. *Ohio Furnace Co.*, 25 T. C. 179 (1955). Actually, in acquiring that stock the corporate petitioner was making an investment the fruits of which under its charter could only be used to benefit New York University. It therefore is clear that all of the net income of the corporate petitioner inured, and must inure to the benefit of an educational organization within the meaning of section 302 (d). Accordingly, we hold that the corporate petitioner was exempt from tax under section 302 (d) for its fiscal years 1948 through 1951. *Ohio Furnace Co., supra; Knapp Brothers Shoe Mfg. Corp.* v. *United States*, 142 F. Supp. 899 (Ct. Cl., 1956).

Respondent's contention that no distribution for the benefit of New York University, either direct or indirect, has been made since 1951 is immaterial, since the question before us is petitioner's exempt status for its fiscal years ended June 30, 1948 through 1951.

Respondent places great reliance upon our decision in *Emanuel N. (Manny) Kolkey*, 27 T. C. 37 (1956), on appeal (C. A. 2, 1957), affd. 254 F. 2d 51 (C. A. 7, 1958), to support his position. In that case we were confronted with an untried business, concededly speculative in nature, whose effectiveness had been immeasurably diminished by adverse rulings of Federal regulatory agencies, and which was purchased for a totally unrealistic purchase price. Furthermore, as a result of dire financial straits of the acquiring corporation, the

transaction was rescinded, and the former owners reacquired their control. On those facts we held the purported sale to be a sham which enabled the old stockholders to withdraw earnings and profits at favorable capital gain rates. The distinction is obvious.

Since we have held that the corporate petitioner was exempt from tax for its fiscal years 1948 through 1951, we do not reach respondent's contention that the interest paid by it on its bonds for those years was nondeductible.

*Decisions will be entered under Rule 50.*