Estate of James L. Hawley, Deceased, Emma N. Hawley, Executrix, and Emma N. Hawley v. Commissioner.
Estate of Hawley v. Commissioner
Docket No. 73110.
United States Tax Court
T.C. Memo 1961-38; 1961 Tax Ct. Memo LEXIS 309; 20 T.C.M. (CCH) 210; T.C.M. (RIA) 61038; February 17, 1961
Fred L. Rosenbloom, Esq., and Thomas P. Glassmoyer, Esq., for the petitioners. David E. Crabtree, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined a deficiency in income tax for the calendar year 1954 in the amount of $19,817.02. The only issue is whether there was a "sale or exchange of a capital asset held for more than 6 months" within the meaning of Section 1222 of the Internal Revenue Code *310 of 1954 when the decedent, James L. Hawley, purportedly sold his 212 shares of common stock in Hugh H. Eby, Inc. along with all other Eby shareholders in 1954 to a church which immediately liquidated the company, transferred or leased the assets to a new operating company in which neither Hawley nor any other former Eby shareholder had a stock interest, the new company put Hawley and the other Eby officers under employment contracts, and profits of the new company were intended to pass through the church untaxed to pay off Hawley and the other former Eby shareholders over a period of five years. Petitioners have conceded other unrelated adjustments which respondent determined in his deficiency notice. Findings of Fact Some of the facts have been stipulated and, as stipulated, are incorporated herein by this reference. James L. Hawley and petitioner, Emma N. Hawley, were husband and wife, residing at 41 Green Hill Lane, Philadelphia, Pennsylvania. They filed a joint income tax return for the calendar year 1954 with the district director of internal revenue, Philadelphia, Pennsylvania. James L. Hawley died testate on October 17, 1959, naming his wife as sole executrix; his estate *311 has been substituted as a party to this action in his place. James L. Hawley, hereinafter referred to as Hawley, was 67 years old at his death. He was employed by Hugh H. Eby, Inc., hereinafter referred to as Old Eby, in 1934 as an accountant. He became secretary and treasurer of the corporation in 1939, and he succeeded the corporation's founder as its president in 1945. Hawley acquired 212 shares of Old Eby common stock in 1945 at a total cost of $212. Old Eby was a Pennsylvania corporation, engaged in the manufacture of a fully integrated line of electronic components, including sockets, terminal strips, binding posts, spring posts, connectors, and plugs. It had an excellent reputation in the industry, and its products were considered to be of a very high quality. It operated a sizable plant in the Germantown section of Philadelphia. This plant by 1953 consisted of some 57,000 square feet of space, was well equipped with all necessary tools and machinery, and employed upwards of 400 persons. Old Eby carried on an active research and development program, particularly in the field of printed circuits. By 1953 it had several hundred active accounts on its books, which included *312 many leaders in the electronic industry such as R.C.A., Philco, Westinghouse, General Electric, Raytheon, Hallicrafters, Arvin Industries, Stromberg-Carlson, Capehart and Magnavox. Old Eby possessed an extensive storage vault of tools, dies, and molds which were carried on its books at a zero basis since these items were charged off against the contracts for which they were originally built. This expensive tooling remained a valuable asset for competitive purposes, however, for it enabled the corporation to fill repeat orders on very short notice and without further investment. To reproduce such tools, dies, and molds would have cost more than $1,000,000 in 1953, but their actual market value was considerably less than this figure since some of the items within the group had become obsolete or were of doubtful continued usefulness. The outstanding capital stock of Old Eby consisted of 1,000 shares of common stock, which immediately prior to December 16, 1953, was held by the following persons: Number of Shares
Jules Sussman
369
James L. Hawley
212
Bernard Offerman
123
Seymour Offerman
123
Louis Offerman
123
Thomas J. Mullaney
50 Sussman and the Offermans *313 had purchased their interests in Old Eby together in 1950. At that time the Offermans paid between $6,000 and $12,000 for their total block of 369 shares. Bernard Offerman became general manager and executive vice president of Old Eby as well as a director in 1950, and Jules Sussman became secretary-treasurer as well as a director. Thomas J. Mullaney had served continually as Old Eby's counsel since 1937 and was a member of the board of directors. Old Eby kept its books on an accrual method of accounting with a fiscal year ending on October 31 of each year. Its net income before taxes and annual earnings and profits after taxes, as well as the net book value of its outstanding stock, for the fiscal years ending in 1951, 1952 and 1953 were as follows: Fiscal Year
Net Income
Earnings & Profits
Stock Net
Ended
Before Taxes
After Taxes
Book Value
10/31/51
$ 89,935.53
$ 57,086.92
$196,619.89
10/31/52
420,665.11
132,408.79
329,028.68
10/31/53
196,429.00
55,113.94
384,142.62
During 1952 two companies negotiated with Old Eby about acquiring or merging with the corporation. Universal American and Standard Industries each made separate offers of about *314 one million dollars in connection with such negotiations but their offers were rejected. In April of 1953 Alfred R. Hunter, a Philadelphia investment bankers associated with Yarnell and Company, representing a group of four bankers and businessmen, approached Bernard Offerman with a proposal whereby the Old Eby shareholders would sell all of their stock to a church, the Institute of Religious Science and Philosophy of Los Angeles, California, hereinafter called the Institute. Hunter explained that upon acquiring the stock, the Institute would liquidate Old Eby and thereby acquire its assets. Hunter and his group would then form a corporation which would purchase the current assets and lease the plant and equipment from the Institute and also obtain a license from the Institute to use the Old Eby patents. The new corporation would thereafter continue the manufacturing business formerly conducted by Old Eby, and the rents and royalties which it paid to the Institute would not be subject to the Federal income tax and would be paid by the Institute to the Old Eby shareholders until the latter were paid in full for their stock. Offerman expressed interest in the Hunter plan, and he *315 made arrangements for Hunter to discuss the matter with Old Eby's counsel, Thomas J. Mullaney. Negotiations continued between the Hunter group and Mullaney representing the Old Eby shareholders from April 1953 to December 1953, when appropriate agreements were executed to effectuate the transfer along the lines proposed by Hunter. During the intervening negotiations, other persons associated with Hunter and representatives of the Institute visited the Old Eby plant and inspected its organization and operation. The persons associated with Hunter included Livingston Sullivan, a wealthy Philadelphia banker and at that time president of the Market Street National Bank, Howard Hansel, a Philadelphia businessman, and Godfrey K. Waters, a San Francisco attorney who was a friend of Sullivan and Hansel and the member of the group who brought the Institute into the plant. They will hereinafter be referred to as the Hunter-Sullivan group. The Institute was represented in the negotiations by S. Arion Lewis, Jr., a California attorney who was a trustee of the Institute. The Institute at all times relevant hereto was a California corporation and an organization exempt from the Federal income *316 tax under the appropriate subsections of Sections 101 and 501 of the Internal Revenue Codes of 1939 and 1954, respectively. In 1955 the Institute's official name was changed to the Church of Religious Science. The Hunter plan of acquisition, including the use of a church as the purported buyer, was copied from a similar transaction in which Livingston Sullivan had taken part involving the acquisition of a company known as Lanolin Plus by a church in Valley Forge, Pennsylvania. All of the significant terms and conditions of the transfer of the Old Eby stock, including the sale price, were agreed upon by September, 1953. However, actual execution of the agreements by the parties was deferred at Jules Sussman's request in order to give his personal counsel, Wolf, Block, Schorr and Solis-Cohen of Philadelphia, an opportunity to review and approve the entire transaction. This approval was given in December, 1953. The Old Eby shareholders initially asked for a price of $3,000,000 for their stock. The Hunter-Sullivan group offered $2,000,000. After extended negotiation, a price of $2,500,000 was agreed upon to be paid in installments over a five-year period. The *317 Hunter-Sullivan group considered this price on the high side, but since the Old Eby shareholders were thought to be the ones who stood to lose the most if the price was too high to be met out of the earnings of the new corporation, it accepted the negotiated figure. There was a gentlemen's agreement among all the parties that if necessary the pay-out period would be extended from three to five additional years. This understanding was never reduced to writing. The Hunter-Sullivan group hoped, at the point when the Old Eby shareholders had been paid in full, to acquire all of the physical assets of the business from the Institute. This possibility was discussed informally with the Institute but was never discussed with the Old Eby shareholders. Nor did the Hunter-Sullivan group ever discuss the possibility of the Old Eby shareholders coming back into the picture as shareholders of the new company to be formed and controlled by the Hunter-Sullivan group. The Old Eby shareholders considered the Hunter-Sullivan group as the true buyer of Old Eby. Since the Hunter-Sullivan group wanted to include the Institute as the nominal buyer, they did not object. They were advised by legal counsel *318 that the gain realized from the sale of their stock would be reportable as long term capital gain for Federal income tax purposes, even with the Institute as the buyer, and once they had received this assurance, which they considered very important, they were willing to go along with the Hunter-Sullivan scheme. Throughout the negotiations, the Old Eby officer-shareholders were led to believe that the Hunter-Sullivan group, particularly Livingston Sullivan, would see to it that the new corporation which was to be organized would have adequate financial backing and also that the group would be in a position to feed some additional profitable business to the new corporation. However, no written commitments were ever made along these lines. Hawley did not take an active part in the negotiations leading to the transfer of the Old Eby stock. Because of his long association with Old Eby, he was reluctant to dispose of his stock. However, because of his advancing years and since he was only a minority shareholder, he felt that he had little choice once the Offermans and Sussman decided to sell. Prior to the time of these negotiations, Hawley had become chairman of the board of directors *319 and Bernard Offerman had taken over the presidency of Old Eby. Hawley then became vice president. At the time the Hunter-Sullivan group offer was made, a corporate policy disagreement existed between Bernard Offerman and Sussman which seemed to threaten the stability of Old Eby. Because of this disagreement and the tension it caused within the corporation, Hawley and the other Old Eby shareholders were especially receptive to the offer, even though Offerman, Sussman, and Hawley were all to remain as employees of the new corporation during the pay-out period. On December 16, 1953, certain documents were signed which put the Hunter-Sullivan proposal into effect. The shareholders of Old Eby, as sellers, and the Institute, as buyer, entered into an agreement, designated as a "Purchase Agreement," under which the shareholders purportedly agreed to sell all of their stock in Old Eby to the Institute for a price of $2,500,000. Under the agreement the purchase price was to be paid as follows: $10,000 within 15 days from the date of the agreement, $190,000 within 30 days from such date, $300,000 on January 1, 1955, and $500,000 on January 1 of each of the years 1956, 1957, 1958, and 1959. *320 The "time of closing" referred to in the agreement was January 4, 1954. The Institute agreed to pledge the Old Eby shares with the Old Eby shareholders, and the latter agreed in turn to look only to this security for payment and not to hold the Institute or any of its members liable for a deficiency. Thus, the Institute assumed no personal liability for the payments required by the Purchase Agreement. A second agreement called a "Consent" was executed by the Old Eby shareholders in which they jointly agreed to the liquidation of Old Eby by the Institute and the leasing of the fixed assets, sale of the quick assets subject to the liabilities, and licensing of the patents all to Huntsull, Incorporated (hereinafter referred to as Huntsull), a Pennsylvania corporation which the Hunter-Sullivan group had formed the previous day, December 15, 1953. The Consent was conditioned upon compliance with the following terms: (1) Huntsull would subordinate all its rights to the shareholders' rights under the Purchase Agreement of the same day. (2) Huntsull would enter into binding employment contracts with Bernard Offerman, Jules Sussman, and Hawley for a term of five years commencing January 1, 1954. *321 (3) Huntsull would consent that the Old Eby shareholders would have the right to exercise the rights of the Institute upon Huntsull's default under the lease and license agreements to be signed that day in the event the Institute failed to exercise such rights. (4) Huntsull would not declare or pay any dividends on its common or preferred stock until the Old Eby shareholders were fully paid under the terms of the Purchase Agreement of December 16, 1953. (5) Huntsull would not alter its capital structure or encumber its assets without prior written approval of the Old Eby shareholders. (6) No change would be made in the lease or license agreements to be signed that day without prior written approval of the Old Eby shareholders. (7) Beginning January 1, 1955, the Old Eby shareholders were to receive monthly payments of 95 per cent of the income received by the Institute from the lease and license agreements with Huntsull. (8) The simultaneous execution by the Institute of a demand judgment note for $1,800,000 without interest and a bond and warrant and mortgage on the Old Eby plant and equipment in the amount of $500,000 without interest, both to the order of the Old Eby shareholders. *322 The note to be further secured by an assignment to the Old Eby shareholders of (a) all preferred stock the Institute was to receive upon the transfer of the cash and net current assets of Old Eby to Huntsull and (b) the lease and license agreements between the Institute and Huntsull. Officers of both the Institute and Huntsull signed the Consent thereby approving and accepting the conditions contained therein. The third instrument signed on December 16, 1953, was a License Agreement between the Institute and Huntsull, whereby the Institute granted Huntsull an exclusive license for five years from January 1, 1954, to make, use, and sell articles under all of Old Eby's patents and patent applications for a minimum annual royalty of $150,000 and further royalties based on a percentage of Huntsull's net profits. This agreement also specifically provided that Huntsull should have the right to use the name "Hugh H. Eby" and to adopt it as its corporate name for the duration of the agreement and that Huntsull should operate and conduct the business formerly carried on by Old Eby. Huntsull agreed to have all its common stock endorsed in blank and turned over to the Institute's agent to *323 be held as security for the payments required of Huntsull under the License Agreement. The fourth instrument was a Lease Agreement whereby the Institute leased Old Eby's plant and equipment to Huntsull for five years at an annual rental of $150,000, the first year's rent payable in advance. Also on December 16, 1953, the Institute by letter authorized the Market Street National Bank of Philadelphia to receive all payments due it under the lease and license agreements with Huntsull and without further authorization to pay such monies over to the Old Eby shareholders according to the Institute's obligations under the Purchase Agreement. Old Eby was liquidated by the Institute and all of Old Eby's assets were transferred to the Institute upon liquidation on December 31, 1953. Old Eby's total current assets on that date were $1,033,034.83, including $203,972.65 cash, and its total current liabilities were $858,929.67. The same day the Institute transferred net current assets of Old Eby to Huntsull in exchange for 1,240 shares of Huntsull's preferred stock of a total par value of $124,000. After this transaction, Huntsull's outstanding 10,000 shares of common stock and 1,330 shares *324 of preferred stock were issued to the following: Common
Preferred
R. Livingston Sullivan
3,000
27
Alfred R. Hunter
3,000
27
Howard Hansel
2,000
18
Godfrey K. Waters
2,000
18
The Institute
1,240 In each case, the consideration paid was ten cents per share for the common stock and $100 per share for the preferred. Also on December 31, 1953, in compliance with the previously executed Consent, the Institute executed a five-year mortgage note in the amount of $500,000, covering the Old Eby plant and equipment and naming as mortgagees, Bernard Offerman and Jules Sussman, Trustees. On January 4, 1954, the Institute executed its judgment note in the amount of $2,300,000 to the order of the same trustees. Bernard Offerman and Jules Sussman held the mortgage note and judgment notes as trustees for all the Old Eby shareholders pursuant to a deed of trust executed by them under date of December 31, 1953. On January 4, 1954, the down payment of $200,000 provided for in the Purchase Agreement was paid by the Institute to the Old Eby shareholders. It was not paid from its own funds but was derived from advance rental and royalty payments which Huntsull paid *325 to the Institute. The Institute invested none of its own funds in the transaction with the Old Eby shareholders. Huntsull obtained the advances paid the Institute by obtaining a loan from the Liberty Real Estate Bank and Trust Company of Philadelphia rather than using any of the cash of Old Eby which it had received from the Institute. The accumulated earnings and profits of Old Eby as of January 4, 1954, the end of its final fiscal period for Federal income tax purposes, were $330,223.22. On February 15, 1954, Huntsull's corporate name was changed to Hugh H. Eby Company, hereinafter referred to as New Eby. New Eby was operated by a nine-man board of directors: Livingston Sullivan, Howard Hansel, and Alfred Hunter, three of the common stockholders; Arion Lewis, Jr. and Norman P. Van Waldenburgh, representing the Institute; and Hawley, Bernard Offerman, Jules Sussman, and Thomas J. Mullaney, four of the Old Eby shareholders. Hawley was chairman of the board, as he had been with Old Eby, under a five-year employment contract at an annual salary of $15,000. Hawley's salary from Old Eby had been $31,200, $42,400 and $46,800 for the fiscal years ending on October 31 of 1951, 1952, *326 and 1953. Bernard Offerman, president of Old Eby, and Jules Sussman, treasurer of Old Eby, retained these offices in New Eby under five-year employment contracts. No member of the original Hunter-Sullivan group (i.e., New Eby's common stockholders) actively participated in the management of New Eby. The Old Eby officers were relied upon to run New Eby. The business operations and customers of New Eby were the same as of Old Eby. New product lines were added to New Eby, but such additions would have been made in any event. During the calendar year 1954, New Eby paid the Institute, pursuant to the lease and license agreements, sums aggregating $360,521.67. New Eby claimed a deduction for such payments as rents and royalties, leaving only $21,992.78 taxable net income for Federal corporate income tax purposes. The Institute in turn paid the Old Eby shareholders sums aggregating $300,000 in 1954, $200,000 of which constituted the down payment and $100,000 was paid in monthly installments from June to December, 1954. Of these sums, Hawley received 21.2 per cent or a total in 1954 of $63,600. In connection with his transfer of Old Eby stock to the Institute, Hawley incurred and paid *327 the following expenses in 1954: brokers' commissions, $2,544; stamp taxes, $322.24. After 1954, no further payments were made to the Old Eby shareholders pursuant to the Purchase Agreement or to the Institute pursuant to the lease and license agreements. Late in 1954 New Eby's profits began to decline, and it became evident that it would be impossible for it to pay the required rents and royalties until conditions improved. During 1955 a public offering of New Eby stock was considered to raise additional capital and settle all the claims of the Institute and the Old Eby shareholders, but this never materialized. The Institute took no steps to enforce its rights under the lease and license agreements upon New Eby's default nor did the Old Eby shareholders take any steps to enforce the Institute's rights as the Consent agreement permitted them to do. Hawley's employment with New Eby terminated in March of 1956, and he received no further compensation from the company after that date. On June 18, 1956, New Eby filed a petition under Chapter X of the Bankruptcy Act with the United States District Court for the Eastern District of Pennsylvania and a trustee was appointed by the Court. *328 On January 10, 1958, the proceedings in the court were converted into proceedings under Chapter XI of the Bankruptcy Act and a Plan of Arrangement was filed. On May 22, 1958, an amended Plan of Arrangement was approved by the Court and the trustee was discharged. Under the amended Plan of Arrangement, all of New Eby's capital stock was acquired by the Sussman Corporation, the common stock of which was all owned by Jules Sussman. In conjunction with the aforesaid Plan of Arrangement, the shareholders of Old Eby, of New Eby (including the Institute), and the Sussman Corporation entered into an agreement, dated March 31, 1958, whereby the shareholders and the Institute transferred all of their rights under the Purchase Agreement of December 16, 1953, and the related agreements which followed to the Sussman Corporation. Pursuant to this agreement, 800 shares of $10 par value Class A preferred stock, 1,120 shares of $100 par value Class B preferred stock, and 369 shares of one dollar par value common stock were issued by the Sussman Corporation as follows: No. of Shares
Class A preferred: The Institute
300
Alfred R. Hunter
150
R. Livingston Sullivan
150
Howard Hansel
100
Godfrey Waters
100
Class B preferred: Bernard Offerman
334
Louis Offerman
333
Seymour Offerman
333
Thomas J. Mullaney
120
Common stock: Jules Sussman
369
*329 The agreement further provided that the Class A preferred stock was to be redeemed, if not before, starting March 31, 1964, in ten equal annual installments at par value plus all dividends accumulated and accrued thereon. Under the same agreement Hawley was to be paid the sum of $50,000 by the Sussman Corporation in weekly installments of $125 per week. After the sale of his Old Eby stock pursuant to the Purchase Agreement of December 16, 1953, neither Hawley nor his wife, petitioner Emma N. Hawley, ever acquired stock in New Eby or in the Sussman Corporation. On his 1954 joint Federal income tax return, Hawley declared a net long term capital gain of $60,991.89 on the sale of his 212 shares of Old Eby stock to the Institute, based on an election under section 453 of the Internal Revenue Code of 1954 to report the total gain realized in the transaction on the installment basis. The respondent in his deficiency notice determined that the entire $63,600 received by Hawley from the Institute in 1954 "constituted dividends and are includable in taxable income." The transaction between the Old Eby shareholders, the Institute, and the Hunter-Sullivan group constituted *330 a bona fide purchase and sale of the Old Eby stock and brought about the complete termination of the Old Eby shareholders' proprietary interest in the business. The payments aggregating $63,600 received by Hawley from the Institute in 1954 constituted the proceeds from the sale of a capital asset held for more than six months. Opinion RAUM, Judge: Whether the transaction before us was in substance a bona fide sale of Hawley's Old Eby stock is a close question and the answer is not free from doubt. Varying results on different records have been reached in other cases raising a similar issue. Estate of Ernest G. Howes, 30 T.C. 909, affirmed sub nom. Commissioner v. Johnson, 267 F. 2d 382 (C.A. 1); W. H. Truschel, 29 T.C. 433; Emanuel N. (Manny) Kolkey, 27 T.C. 37, affirmed, 254 F. 2d 51 (C.A. 7).[1] Although we could marshall the various facts on both sides of the question in the present case and discuss them in the light of the contentions made by the parties, we feel that such an effort would be fruitless. Extended discussions of factual materials pro and con, terminating in a conclusion that is based in the last *331 analysis upon a subjective judgment about the weight of the various materials considered, often gives merely the illusion of a process of reasoning, when in fact the result reached is simply the trial court's ultimate finding on the record as a whole. Suffice it to say that we have considered all the evidence great care and have reached the conclusion, without strong conviction, that Hawley in fact made a sale of his stock. The capital gains provisions are therefore applicable. The weight of the evidence brings this case closer to the Howes and Truschel cases where a like result was reached than to the Kolkey case holding otherwise because the Court felt that the transaction there involved was a sham. Decision will be entered under Rule 50. Footnotes
1. For a discussion of the general problem see Moore and Dohan, Sales, Churches, and Monkeyshines, 11 Tax L. Rev. 87↩ (1956).