BREWER-FAY INVESTMENT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WEST SACRAMENTO ENTERPRISES, INC. (FORMERLY CALIFORNIA RICE DRYERS, INC.), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 93149, 93150. Filed March 18, 1963.

*Joseph L. Alioto, Esq.*, for the petitioners.
*Richard E. Lobedan, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined the following deficiencies in income tax:

| Docket No. | Taxable year ending Aug. 31— | Deficiency |
|---|---|---|
| 93149 | 1957 | $15,235.45 |
| | 1958 | 15,599.45 |
| 93150 | 1957 | 15,168.48 |
| | 1958 | 15,168.48 |

The issues are (1) whether certain facilities owned by petitioners came within the definition of a "grain-storage facility" contained in section 169(d) of the Internal Revenue Code of 1954;[1] (2) if not, what useful life must be assigned to said facilities for purposes of depreciation deductions; and (3) determination of the useful life of certain ranch buildings, fences, and improvements.

FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Petitioners are corporations organized under and by virtue of the laws of California, with their principal places of business at West

---

[1] Unless otherwise noted, all Code references are to the Internal Revenue Code of 1954.

Sacramento, Cal. Their income tax returns for the fiscal years ending August 31, 1957, and August 31, 1958, were filed with the district director of internal revenue at San Francisco, Cal.

Brewer-Fay Investment Company (hereinafter referred to as Brewer-Fay) was incorporated September 17, 1952, under the laws of the State of California. The capital stock was owned 50 percent by George W. Brewer and 50 percent by Norvin Fay at all relevant times.

On September 30, 1953, Brewer-Fay completed a bulk flat storage rice warehouse, known as Warehouse No. 3, at a cost of $136,329.18. In May of 1956 an aeration system costing $16,454.15 was added to said warehouse. The cost of the warehouse and aeration system was amortized over a period of 5 years pursuant to section 169 of the Internal Revenue Code.[2] The amortization was deducted on the corporation's Federal income tax returns as follows:

| Year ended Aug. 31— | Original warehouse | Aeration system | Total |
|---|---|---|---|
| 1954 | $24,993.68 | 0 | $24,993.68 |
| 1955 | 27,265.84 | 0 | 27,265.84 |
| 1956 | 27,265.84 | $822.71 | 28,088.55 |
| 1957 | 27,265.84 | 3,290.83 | 30,556.67 |
| 1958 | 27,265.84 | 3,290.83 | 30,556.67 |
| 1959 | 2,272.14 | 3,290.83 | 5,562.97 |
| 1960 | 0 | 3,290.83 | 3,290.83 |

California Rice Dryers, Inc. (sometimes hereinafter referred to as Rice Dryers), was incorporated September 25, 1953, under the laws of the State of California.[3] The stock of the corporation was owned in equal amounts by George W. Brewer, Horace B. Wulff, Norvin Fay, and J. Alioto at all relevant times.

As of September 30, 1953, Rice Dryers completed construction of a rice drier and connecting storage bins and bin equipment, the rice drier at a cost of approximately $130,000 and the storage bins and equipment at a cost of $140,986.75. In 1954 subsequent additions consisting of an aeration system and other equipment were made at a cost of $13,906.64. The cost of the storage bins and equipment was amortized over a period 5 years pursuant to section 169 of the Internal

---

[2] SEC. 169. AMORTIZATION OF GRAIN-STORAGE FACILITIES.

(a) ALLOWANCE OF DEDUCTION.—

(1) ORIGINAL OWNER.—Any person who constructs, reconstructs, or erects a grain-storage facility (as defined in subsection (d)) shall, at his election, be entitled to a deduction with respect to the amortization of the adjusted basis (for determining gain) of such facility based on a period of 60 months. * * *

[3] Petitioner in Docket No. 93150, West Sacramento Enterprises, Inc., was known as California Rice Dryers, Inc., at all times material hereto.

Revenue Code. The amortization was deducted on the corporation's Federal income tax returns as follows:

| Year ended Aug. 31— | Amount |
|---|---|
| 1954 | $26,020.08 |
| 1955 | 30,978.68 |
| 1956 | 30,978.68 |
| 1957 | 30,978.68 |
| 1958 | 30,978.68 |
| 1959 | 4,958.59 |

Brewer-Fay's Warehouse No. 3 and Rice Dryers' storage bins were permanently equipped for receiving, elevating, conditioning, and loading out rice at all times material hereto.

Brewer-Fay Warehouse No. 3, the only Brewer-Fay warehouse here in question, is stipulated to have come within the coverage of an agreement entered into in 1952 with West Sacramento Storage Company, under which the said Storage Company operated Warehouse No. 3 and paid all of the expenses of the storage operation other than property taxes, insurance, and repairs. Of each $3.16 per ton received by Storage Company for storage of rice in Warehouse No. 3, $2.16 was paid to Brewer-Fay as rent. Under the agreement, this rental figure was subject to change to the extent of one-half of any increase or decrease in the rates established by the Public Utilities Commission for public warehouses within a radius of 50 miles from the demised premises.

The said agreement, which was operative and effective in the years in question, provided in part:

It is understood and agreed that the leased premises shall be used and employed by the Lessee for the purpose of conducting a private warehouse business and any incidental or accessory business, provided, however, the Lessee shall have the right to use the premises for a public warehouse business if said Lessee some time in the future elects to enter into such business.

A similar agreement, operative during the years in issue, was entered into between Rice Dryers and a company named Brewer Enterprises, Inc., covering the storage of rice in Rice Dryers' storage bins. Storage Company, however, acted as the warehouse operating company for the Rice Dryers' bins and paid all normal warehousing expenses and labor.

Storage Company was owned in equal shares by George W. Brewer, Norvin Fay, and Horace B. Wulff at all times material hereto. It was managed by D. A. Shellooe (hereinafter referred to as Shellooe), who was manager of Brewer-Fay and Rice Dryers.

The letterhead used by Storage Company read:

PRIVATE
WAREHOUSING

PHONE:
FRontier 1-7450

WEST SACRAMENTO STORAGE COMPANY
P. O. Box 516
WEST SACRAMENTO, CALIFORNIA

In an application to the commissioner of corporations of the State of California with respect to issuing stock, Storage Company stated that its business was a private warehousing business.

Neither petitioner has received nor employed a license from the Public Utilities Commission of the State of California or from the department of agriculture of that State. All references to Storage Company's being in the business of private warehousing were made for the purpose of indicating that the facilities operated by Storage Company were not licensed by the Public Utilities Commission.

The storage capacity of Rice Dryers' bins was 4,000 tons, and the capacity of Brewer-Fay's Warehouse No. 3 was 22,000 tons. The complex of storage facilities operated by Storage Company was not limited to the facilities here in question.

In the months of February and March 1952, Storage Company entered into approximately 25 contracts with growers and driers of rice (other than Rice Dryers) for the storage of dried rice. These agreements obligated Storage Company to store a total of approximately 24,275 tons of rice annually for a period of 5 cropping years, commencing with the crop of 1952. Each continued in effect after the end of the 5 cropping years unless written notice of termination was given. The rice harvest in California occurs during the months of September and October, and the obligation to store rice for any cropping year ended on the first day of September of the year after the rice was harvested.

The agreements recited, in part:

2. The Producer hereby agrees that he will store annually for a period of 5 cropping years, commencing with the crop of 1952, * * * tons of paddy rice (in bulk) produced (if any be so produced) by him or for his account or in which he has any interest (directly or indirectly) with Warehouseman at its said warehouse in West Sacramento, or such other similar warehouse that may be hereafter designated by Warehouseman and that said Producer further agrees that he will deliver such rice in bulk to such a warehouse or warehouses.

3. The warehouseman agrees to receive, store such rice and perform all the services of a private warehouseman and for such storage and service the warehouseman will charge the producer such rate or rates as may conform to the rate or rates established by the Utilities Commission of the State of California for public warehouses situate within the area, that is, within a fifty (50) mile radius of warehouseman's said private warehouses.

In 1953, 60 individual rice growers entered into agreements signed by Shellooe for the drying and storage of approximately 32,480 tons of rice. The agreements provided in part as follows:

WHEREAS, the parties hereto recognize that there is a shortage of rice dryers as well as bulk storage rice warehouses in West Sacramento and vicinity, and Dryer is willing to construct such a rice dryer and incidental storage space in West Sacramento in consideration of the Producer and other producers agreeing for an agreed period to dry and store sufficient rice therein to warrant such investment; and

WHEREAS, the Producer is willing to agree to dry the quantity of rice hereinabove mentioned (limited only to capacity of dryer) for the coming rice season and for the ————next succeeding cropping seasons in such dryer and warehouse to be constructed by Dryer.

Now, THEREFORE, IT IS AGREED between the parties hereto as follows:

1. That for and in consideration of the agreements of Producer hereinafter set forth as well as like agreements with other producers, the Dryer does hereby agree to construct in West Sacramento, a rice dryer with accompanying warehouse space and to have the same constructed and operating in time to receive the 1953 crop of Producer for drying, delays by the act of God or other matters and things beyond the control of Dryer excepted.

2. Producer hereby agrees that he will dry and store annually for a period of ———— cropping years, commencing with the crop of 1954, approximately ———— tons of paddy rice (in bulk) produced (if any be so produced) by him or for his account or in which he has any interest (directly or indirectly) with Dryer at its dryer and storage space in West Sacramento, or such other warehouse that may be hereinafter designated by Dryer, and that said Producer further agrees that he will deliver such rice in bulk to such Dryer, and that said Producer does hereby agree to pay the charge of the Dryer for such drying and storage that may be required. It is further agreed that the Producer may hold back such quantity of rice as he deems necessary for his own seed purposes.

3. The Dryer agrees that it will dry Producer's rice down to a moisture content not to exceed fourteen per cent (14%) and will store said rice at such warehouse as hereinabove provided and for drying will charge the sum equivalent to the charge for like service prevailing in the vicinity of Dryer's plant, and for storage, will charge a sum equivalent to the rate established by the Public Utility Commission of the State of California for public storage of bulk rice within the area, that is, within a fifty (50) mile radius of said private dryer and warehouse.

\* \* \* \* \* \* \*

6. Producer agrees that Dryer may commingle Producer's paddy rice with the rice of other producers either in drying or storing, or both.

7. It is particularly understood and agreed that from and after the end of the term hereof, this contract shall continue to be operative and effective from year to year unless and until written notice terminating this agreement is given by either party to the other before the 31st day of December of the year preceding the year in which such termination occurs, and upon receipt of such written notice this contract shall terminate and end as of the first day of September following the giving of such notice. \* \* \*

\* \* \* \* \* \* \*

9. It is understood that the Dryer contemplates the creation of a corporation to own and operate the dryer and warehouse facilities and that the Producer hereby consents that the Dryer may transfer his contract and all his right and obligations thereunder to such corporation when created and that upon such transfer, said Dryer is relieved from all obligations hereunder, and the corporation so created shall then assume and agree to perform this contract and be entitled to receive all of the benefits thereunder.

10. It is understood and agreed that for any and all drying and storage herein provided that the Dryer and his assigns will operate such dryer and warehouse business as a private dryer and warehouse, that is, for the drying and storage of rice belonging to the Producer or other producers who have signed like agreements.

All of these contracts were for a period of 5 cropping years with the exception of one 3-year contract.

These drying and storage agreements were assigned to Brewer Enterprises, Inc., the company to which Rice Dryers had leased its facilities in September 1953. During that month Brewer Enterprises, Inc., arranged to have stored for it by Storage Company approximately 35,000 tons per year, for at least 5 years commencing with the 1953 crop, of the rice for which it was under contractual obligation with rice growers to provide storage. The agreement between Brewer Enterprises, Inc., and Storage Company provided, in part:

WHEREAS, the party of the first part is now engaged in West Sacramento in drying and storing rice and has contracted with certain rice growers for the drying and storing of such growers' rice for a term of years, and

WHEREAS, the party of the first part desires to procure storage for the rice of said growers, and

WHEREAS, the party of the second part is willing to undertake such storage for the party of the first part upon the terms and conditions hereinafter stated.

NOW, THEREFORE, IT IS AGREED between the parties hereto as follows: to-wit:

1. That the party of the first part hereby agrees that it will store for a period of five (5) cropping years, commencing with the crop of 1953, approximately thirty-five thousand (35,000) tons of paddy rice (in bulk) which they have contracted with growers to dry and store, with the party of the second part at either or both of its private warehouses situate in West Sacramento or such other private warehouse as may be hereafter designated by the party of the first part and that said party of the first part further agrees that it will haul and deliver all of such rice in bulk to such private warehouse or warehouses, save and except the party of the first part reserves to itself the right to store such portion of said paddy rice hereinabove mentioned as it may elect in the tanks which are a part of its rice dryer or dehydrator.

2. The party of the first part agrees to pay for such storage at a rate per ton which is equivalent to the rate established by the Public Utilities Commission from time to time for rice storage and services in public warehouses within the area (area to be deemed the area within a fifty (50) mile radius of the site to the first party's dryer.

3. That the party of the first part agrees to store all such rice so delivered and to perform all storage and other private warehousing services at the rates specified in the foregoing Paragraph and upon the delivery of each load of rice the party of the second part agrees to issue a non-negotiable statement of storage

to the then owner which statement should contain the weight of said rice and such other pertinent matters and things of and concerning such rice.

From 1954 to 1956, 22 individual rice growers entered into contracts for the drying and storage of approximately 12,900 tons of rice in the facilities operated by Storage Company. These contracts were identical to the above-mentioned contracts for drying and storage entered into by 60 growers in 1953. All were for a period of 5 cropping years.

During the years in question substantial amounts of rice were stored in Brewer-Fay Warehouse No. 3 and the Rice Dryers' storage bins pursuant to the 1952 storage agreements and the agreements for drying and storage entered into from 1953 to 1956. All of this rice stored in these facilities for the taxable years under review belonged to members of Rice Growers Association of California.

Rice Growers Association of California (hereinafter referred to as Association) is an agricultural marketing cooperative whose officers and directors for the years involved were as follows:

Ernest L. Adams, President
Hugh W. Baber, Vice President
Ralph A. Crowe, Secretary-Treasurer
George W. Brewer, General Manager
Horace B. Wulff, Director

Neither Norvin Fay nor Joseph L. Alioto was an officer or director of Association during these years.

Association had no interest in either Brewer-Fay or Rice Dryers at any time material hereto.

In 1957 and 1958 there were five companies, including agricultural cooperatives, engaged in the milling of rice in California. A sixth company that had been so engaged was purchased by Association in November 1956. Three of the millers were cooperatives; Association was one of these. The three cooperatives controlled approximately 80 percent of the California rice industry, and Association was the largest of these, accounting for 60 or 65 percent of the entire industry in the State.

Association owned two rice mills in West Sacramento, one in Biggs, and one in Woodland, Cal. The mill owned by one of the other cooperatives was also located in West Sacramento, and the mill owned by the third cooperative was in South Dos Palos, Cal. Two noncooperative mills were in San Francisco and Stockton, California.

The facilities in question here are located on property which adjoins the property on which is situated one of the Association-owned rice mills. There are warehouses located adjacent or nearly adjacent to all rice mills throughout California with the exception of the mill in San Francisco.

In the California rice industry those warehouses that are located very close to rice mills generally store rice that is ultimately destined for those mills. All of the rice stored in the years in question, pursuant to the agreements mentioned above, in Brewer-Fay's Warehouse No. 3 and Rice Dryers' storage bins was delivered to the adjoining Association mill after it left said facilities.

One who was not a member of Association would be at a disadvantage in storing his rice in petitioners' facilities, as he would eventually have to transport his rice to another mill and would therefore be paying additional freight. Conversely, those members of Association intending to have their rice milled by Association could minimize freight costs by storing their rice in facilities close to an Association mill.

Storage in petitioners' facilities was not restricted to rice belonging to Association members, and there was no rule or regulation, written or oral, that it should be so restricted. Shellooe and Storage Company did not refuse to negotiate with anyone who was not an Association member and never turned down an applicant for storage on the ground that he was not a member.

Storage Company stored rice, pursuant to certain of the storage agreements made in 1952, for commercial rice driers who could dry more rice than they could store. A number of these driers were not members of Association, and Association had no interest in or connection with them. A few were driers the major portion of whose rice storage was milled by a competitor of Association.

In addition to the rice stored for growers and commercial driers of rice, substantial amounts of rice owned by the Commodity Credit Corporation (hereinafter sometimes referred to as C.C.C.) have been stored in the facilities here in question. In excess of 20,000 tons of C.C.C. rice were stored in 1957 and 1958 in the facilities operated by Storage Company, and a considerable portion of the income of petitioners in the years under review was derived from such Government storage. The C.C.C. held part of its rice from the 1956 crop for as long as 2 years in Brewer-Fay Warehouse No. 3.

The C.C.C. became the owner of rice stored in these facilities in connection with the Government's commodity support program. Those rice producers who were unable to market their crop could elect, if there was compliance with certain regulations, to sell their rice to the C.C.C. The rice purchased by the C.C.C. was taken over while in storage, and payment was made to the seller. The Government was then the absolute owner of such rice.

When the Commodity Credit Corporation became the owner of rice, its policy was not to move such rice as long as it was in qualified

storage. Qualification for this storage primarily involved a showing of the warehouse's financial responsibility. At a time in 1953 when there was considerable rice to be placed under support, an arrangement was devised in order to provide rapid qualification of the facilities in question along with about 15 other warehouses. This arrangement involved the "leasing" of the facilities to Association so that they could in effect be guaranteed by Association, thus necessitating only one application for all the warehouses.

The agreements with Association covering the facilities in question provided for a nominal consideration of $1 per year to be paid by Association. No more than $1 per year was paid by Association in respect of petitioners' facilities. The agreements provided in part:

3. This property is being leased for the purpose of providing storage for rough rice of the Lessee which is sold to and owned by the Commodity Credit Corporation.

4. Each of the parties hereto has the right and privilege of terminating this lease at any time after the rough rice now owned by the Commodity Credit Corporation has been entirely removed from said storage facilities which termination may be effected by either party by giving a notice in writing, delivered to the other party, setting forth such termination and upon the delivery of such written notice, said lease and all leasehold interests thereby created shall terminate ten (10) days thereafter.

Association had no interest in the rice stored in petitioners' facilities by the C.C.C. All of the fees received from the Government for storage of C.C.C. rice in these facilities were paid to Association, but all of these fees were in turn passed on by Association to the storing corporations.

When the C.C.C. disposed of the rice it had in storage, such rice was usually offered to rice mills on a competitive bid basis. The best bidder got the rice, and Association got no preference in bidding on the rice stored in petitioners' facilities. C.C.C. rice stored in these facilities has been purchased by mills that are competitors of Association.

All rice stored in the facilities in question was stored in bulk. It was commingled, and a sampling was taken in order to appraise the rice of each party storing rice therein. Statements of storage were issued to identify ownership of said rice.

There was a shortage of storage space for rice in California in the years 1952, 1953, and 1954.

Respondent's deficiency notice to both petitioners disallowed amortization deductions under section 169 of the Internal Revenue Code because of his determination that "the facilities were not used to store grain produced by [petitioners] or in a public warehouse business."

ULTIMATE FINDING OF FACT.

Brewer-Fay's Warehouse No. 3 and Rice Dryers' storage bins were public grain warehouses within the meaning of section 169(d)(2) of the Internal Revenue Code for the taxable years under review.

OPINION.

Those structures in respect of which an amortization deduction is allowable under section 169(a) of the Internal Revenue Code are delineated in section 169(d) thereof, which provides in pertinent part as follows:

SEC. 169(d). DEFINITION OF GRAIN-STORAGE FACILITY.—For purposes of this section, the term "grain-storage facility" means—

(1) any corn crib, grain bin, or grain elevator, or any similar structure suitable primarily for the storage of grain, which crib, bin, elevator, or structure is intended by the taxpayer at the time of his election to be used for the storage of grain produced by him (or, if the election is made by a partnership, produced by the members thereof) ; and

(2) any public grain warehouse permanently equipped for receiving, elevating, conditioning, and loading out grain,

the construction, reconstruction, or erection of which was completed after December 31, 1952, and on or before December 31, 1956. * * *

Petitioners do not contend that the facilities in question were ever intended to be used for the storage of grain produced by them, within the purview of section 169(d)(1), but rely on 169(d)(2) for support of the disputed deductions. The requirements of the portion of section 169(d) set out above as to the completion date and permanent equipment of these facilities have been met, therefore the determination to be made is whether, for the taxable years under review, the said facilities were "public grain warehouse[s]" within the meaning of said section.

Petitioners and respondent agree that this determination is to be made in the light of how the warehousing business was in fact conducted with respect to these facilities. No cases involving the question of what is meant by the words "public grain warehouse" in section 169(d)(2) have been cited to us, and we have found none.

Respondent urges that the fact that petitioners had neither registered their facilities under the California Agricultural Code[4] nor

---

[4] The relevant portions of the California Agricultural Code are as follows:

Sec. 1260. Definitions

As used in this chapter:

(a) "Warehouse" means every elevator, building, structure, or other protected inclosure within the State, in which any grain is or is to be regularly stored for the public.

Sec. 1260.15. Registration of public grain warehouses ; fees

It shall be unlawful to operate, conduct or maintain a public warehouse for grain storage without having registered such warehouse with the director. * * *

received a license under the California Public Utilities Code [5] is conclusive of the matter against petitioners. His contention is that the lack of registration or licensing under the California statutes results in the facilities not being public warehouses under California law, and he would have us conclude consequently that they are not public grain warehouses for purposes of Federal income tax legislation. [6]

Our decision is not governed by California law in this respect. *Burnet* v. *Harmel*, 287 U.S. 103, 110 (1932).

Here we are concerned only with the meaning and application of a statute enacted by Congress, in the exercise of its plenary power under the Constitution, to tax income. The exertion of that power is not subject to state control. It is the will of Congress which controls, and the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nationwide scheme of taxation. * * * State law may control only when the operation of the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law. * * *

We find no such language or necessary implication with regard to what is included by the phrase "public grain warehouse" in section 169(d)(2) of the Internal Revenue Code, and we think Congress intended a uniform standard as to the availability of the deduction for amortization of grain-storage facilities.

Congress has not made explicit what facilities are to be deemed encompassed by the language employed in section 169(d)(2), how-

---

[5] The relevant portions of the California Public Utilities Code in effect during the years in question were as follows:

Sec. 239. Warehouseman

(a) "Warehouseman" includes:

* * * * * * *

(b) Every corporation or person owning, controlling, operating, or managing any building, structure, or warehouse, in which merchandise, other than secondhand household goods or effects, and other than liquid petroleum commodities in bulk, and other than merchandise sold but retained in the custody of the vendor, is regularly stored for the public generally, for compensation, within this State, * * *

Sec. 1051. Certificate of convenience and necessity; * * *

No warehouseman shall begin to operate any business of a warehouseman, as defined in subdivision (b) of Section 239, in any city or city and county of this State having a population of 150,000 or more, without first having obtained from the commission a certificate declaring that public convenience and necessity require or will require the transaction of business by such warehouseman. * * *

[6] Respondent erroneously states that Rev. Rul. 54-44, 1954-1 C.B. 126, and Rev. Rul. 54-58, 1954-1 C.B. 127-128, hold that qualification under either a Federal or State warehousing law is essential for the allowance of a deduction for amortization of a grain-storage facility. These rulings merely involved situations in which the Internal Revenue Service ruled that certain facilities which were licensed under the United States Warehouse Act and the Revised Code of Washington, respectively, did qualify for a deduction under section 124B, I.R.C. 1939. They do not say that such licensing is determinative, nor do they deny a deduction for lack of such licensing.

ever. The meaning of the words used in this section is ambiguous.[7] Therefore we look to the purpose of the section to ascertain what is meant by them. *United States* v. *Pelzer*, 312 U.S. 399 (1941).

Where the language and purpose of the questioned statute is clear, courts, of course, follow the legislative direction in interpretation. Where the words are ambiguous, the judiciary may properly use the legislative history to reach a conclusion. * * *

*United States* v. *Public Utilities Commission*, 345 U.S. 295, 315 (1953).

The provisions of section 169 were carried over without substantive change from section 124B of the Internal Revenue Code of 1939.[8] S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 207 (1954). Section 124B of the Internal Revenue Code of 1939 was added by section 206 (a) and (c) of the Technical Changes Act of 1953. The relevant part of the accompanying House Report stated as follows:

A critical shortage of facilities for storing grain has developed throughout the Nation during the past several years. This shortage has been felt particularly by producers of such grains as wheat and corn. In view of the situation which has arisen, your committee has felt impelled to provide an inducement for taxpayers to construct new grain-storage facilities, to increase the capacity of those already in existence, or to adapt existing construction to the storage of grain.

* * * * * * *

This special amortization deduction is available to a farmer constructing a grain-storage facility. * * * The deduction is also available to any person who constructs any public grain warehouse permanently equipped for handling grain. Under the definition of a grain-storage facility the special amortization deduction is not allowed to persons who store only grain purchased for consumption in their business. For example, persons engaged in the milling of flour who construct storage facilities for purchased grain used in such processing would not be allowed to deduct the cost of any facilities under this provision.

H. Rept. No. 894, 83d Cong., 1st Sess., p. 6–7 (1953), 1953–2 C.B. 512. The Senate report is identical in all material aspects with regard to this section.

---

[7] Reference to any highly regarded dictionary reveals the ambiguity attending the use of the word "public." The words "public warehouse" taken together were said in Webster's New International Dictionary (2d ed. 1954) to have the broad common meaning of "a warehouse in which are stored goods belonging to others than the owner of the warehouse," and just a few years later were potentially more narrowly defined by the same lexicographer, in Webster's New International Dictionary (3d ed. 1961), as "a privately owned warehouse for public use." The term "public warehouse" as used in a legal context has no common meaning apart from considerations of State laws. See 93 C.J.S., sec. 1, et seq.

[8] There was no relevant debate of section 169 on the floors of Congress at the time of its enactment as a part of the Internal Revenue Code of 1954.

It is evident that the purpose of section 124B of the Internal Revenue Code of 1939 was to encourage the construction of facilities for the storage of grain at a time when there was an urgent need for such construction. The need was general, not just for a specific class or classes of such facilities. We do not think that a narrow interpretation of the words "public grain warehouse" was intended.

It is not necessary to repeat the facts of this case at length. During the years in question the facilities of petitioners that are here under review were used by numerous producers for the storage of rice grown by them, as well as by others who had agreed to store the rice of such producers and by the Commodity Credit Corporation. To hold that facilities such as these are not "public grain warehouse[s]" within the meaning of section 169(d)(2) of the Internal Revenue Code would be to restrict the scope and effectiveness of this legislation to a degree not required by its language and not consistent with the urgency reflected by it.

Section 1.169-2(c), Income Tax Regs., provides in part as follows:

The term "public grain warehouse" as used in section 169(d) includes only a grain warehouse or elevator transacting business with members of the general public. The amortization deduction, however, is not available to a person who stores only grain purchased for consumption in his business, such as a milling company which constructs storage facilities for purchased grain held for processing. * * *

Interpreting this regulation in the light of the congressional purpose, we find that the facilities in question were public grain warehouses during the years under consideration.

Respondent argues that an exclusive-dealing agreement between petitioners and Association must be implied by reason of the fact that the rice-storage fees received by petitioners in the years in question were derived from members of Association and from Association itself (referring to the fees received from Commodity Credit Corporation via Association). This conclusion is contradicted by the record. There was no limitation of the use of these facilities to Association's members or to others dealing with Association. Nonmembers were given long-term storage contracts, and rice stored in the facilities was on occasion milled by others than Assocation. The so-called "lease" of the facilities to Association did not serve as anything more than a method of qualifying them for C.C.C. storage.

That the rice stored in these facilities in the years in question was milled by Association does not alter our conclusion that they were public grain warehouses. The members of Association comprised a

very substantial portion of the California rice-producing public, and the common practice in the California rice industry is to store rice close to the mill in which it is to be processed. To hold in this case, in the words of section 1.169–2(c), Income Tax Regs., that the "general public" with which a grain warehouse is to transact business to qualify as "public" must include persons who would not find it desirable or practical to do business with petitioners would be to ignore economic reality.

Respondent contends that it would be inappropriate for us to find these facilities to be public warehouses when they have been held out to the public and denominated in lease agreements as private warehouses. Our decision is necessarily limited to a determination as to the status of said facilities for purposes of section 169 of the Internal Revenue Code. How the facilities were represented to the public for reasons of State laws not binding upon us is not determinative of this issue. Petitioners' lack of compliance with certain California regulatory legislation which used the same definitive words as are used in section 169(d)(2) of the Internal Revenue Code, is material and has been weighed by us in arriving at our ultimate conclusion, but it is not the sole determinant, and after weighing all of the evidence we have concluded that these warehouses came within the definition of a grain-storage facility contained in section 169(d)(2) of the Internal Revenue Code, and therefore that the amortization deductions claimed by petitioners were properly taken.

Because of this finding, it is not necessary to consider the issue of what useful life would properly be assignable to the warehouse facilities in question for purposes of depreciation under section 167 of the Internal Revenue Code.

A portion of each of the deficiencies assessed in Docket No. 93149 involved a determination that the useful lives of certain ranch buildings, fences, and improvements were other than those used by Brewer-Fay for purposes of depreciation deductions taken in the years in question. The petition placed this matter in issue with respect to the taxable year ending August 31, 1957, but the issue has not been pursued with proof or argument. Accordingly, respondent's determination is upheld with respect to this issue.

Reviewed by the Court.

> *Decision will be entered under Rule 50 in Docket No. 93149.*
>
> *Decision will be entered for the petitioner in Docket No. 93150.*