ROYAL FARMS DAIRY CO., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93193–93195. Filed April 29, 1963

*Joseph D. Peeler,* and *Frederick B. Warder, Jr.,* for the petitioners. *David R. Brennan,* for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in the income tax liability for petitioners for the years and in the amounts as follows:

| | Year | Deficiency |
|---|---|---|
| Royal Farms Dairy Co., Docket No. 93193 | 1953 | $80,953.19 |
| | 1954 | 164,428.04 |
| | 1955 | 182,369.61 |
| | 1956 | 177,035.74 |
| Estate of Joseph R. Bahan, deceased, Joseph F. Schneider and Edward J. Murphy, coexecutors, and Lillian A. Bahan, Docket No. 93194. | 1954 | 84,466.53 |
| | 1955 | 58,980.91 |
| | 1956 | 79,200.77 |
| James E. Bahan and Mary E. Bahan, Docket No. 93195 | 1954 | 85,040.07 |
| | 1955 | 73,024.72 |
| | 1956 | 78,526.35 |

The only issue presented as to the individual petitioners is whether the amounts reported by them as installment receipts from the sale of their stock in a creamery company and taxable to the extent of gain

---

[1] Proceedings of the following petitioners are consolidated herewith: Estate of Joseph R. Bahan, Deceased, Joseph F. Schneider and Edward J. Murphy, Coexecutors, and Lillian A. Bahan, Docket No. 93194; and James E. Bahan and Mary E. Bahan, Docket No. 93195.

at capital gain rates, should instead be treated in entirety as ordinary income.[2]

The only issue presented as to the corporate petitioner is whether the amounts it paid in the form of rent to University Hill Foundation are deductible as rental expense.

FINDINGS OF FACT

Some of the facts are stipulated and are hereby found as stipulated.

Petitioner Royal Farms Dairy Co. (hereinafter sometimes referred to as Royal #2) was incorporated in California on July 30, 1953, under the name of B & R Dairy Co. Its name was changed to Royal Farms Dairy Co. on August 26, 1953.

Petitioners James E. and Mary E. Bahan (hereinafter sometimes referred to as James and Mary, respectively) are husband and wife. Joseph R. and Lillian A. Bahan (hereinafter sometimes referred to as Joseph and Lillian, respectively) were husband and wife during the years in issue. Joseph died on September 13, 1959. Joseph F. Schneider and Edward J. Murphy are the duly appointed and acting executors of Joseph R. Bahan's estate. James, Mary, Joseph, and Lillian will hereinafter sometimes be referred to collectively as the individual petitioners.

During the years in issue, the petitioners all had the same address (9923 Atlantic Boulevard, South Gate, Calif.) and all filed their Federal income tax returns with the district director of internal revenue at Los Angeles, Calif. All the returns were for calendar years, except that Royal #2's first return was for the partial year July 30, 1953, through December 31, 1953.

James and Joseph were brothers. In 1931 they formed a partnership, Royal Farms Dairy Co. (hereinafter sometimes referred to as Partnership), to operate a creamery business. Joseph and James continued to operate the creamery as a partnership until 1946.[3]

On January 18, 1946, the individual petitioners incorporated Royal Farms Dairy Co. (hereinafter sometimes referred to as Royal #1), under the laws of California.

Upon their transfer to Royal #1 of all of Partnership's assets with an agreed value of $912,363, James and Joseph were each issued 2,300 shares and Lillian and Mary each 2,260 shares of Royal #1 stock. They continued to hold those shares until July 31, 1953.

---

[2] Respondent disputes neither petitioners' claimed bases in the stock, petitioners' claimed holding periods, nor the amounts petitioners reported as receipts from this transaction in each of the years before us on this issue.

[3] Documents stipulated into evidence recite that George Ritter joined James and Joseph in the founding of Partnership in 1931, that Ritter withdrew in 1945, that he was paid $117,637.32 for his share of Partnership's goodwill, and that James and Joseph continued the business as a partnership until 1946. The truth of these documentary recitals was not stipulated. The difference between the oral testimony, reflected in the findings, and the documentary recitals does not appear to be material to the issues of this case.

The principal activity of Royal #1 and Partnership was the processing and retail and wholesale selling of milk. The success of the business was attributable principally to Joseph and James.

Loyola University Foundation (hereinafter sometimes referred to as Foundation) was chartered in California on April 26, 1945, for the purpose of raising funds for Loyola University. Foundation's exemption certificate, granted in 1946, was subsequently revoked by the Commissioner of Internal Revenue. Foundation's name was changed to University Hill Foundation on October 10, 1952. In 1953 its board of directors consisted of C. Kevin Malone, J. P. Carroll, and Paul R. Cote (hereinafter sometimes referred to as Father Malone, Carroll, and Cote, respectively).

James had known Father Malone from before 1950 until Father Malone's death in 1956.

In 1952, sometime after Father Malone had first spoken to James about Foundation, Father Malone suggested to James that the stockholders of Royal #1 consider a sale of all its stock to Foundation. There were further discussions and negotiations over a period of months between James and Father Malone regarding the price. Father Malone offered about $2,100,000 and James countered with a price of about $3 million. Later Father Malone raised his offer to $2,300,000, and then to $2,600,000. James reduced his price to $2,900,-000, and then to $2,800,000. After further negotiations, Foundation and the individual petitioners agreed upon a total price of $2,680,000 for all the stock, together with the other terms and conditions of the sale.

On July 31, 1953, an agreement was executed providing for the sale of all the outstanding shares of Royal #1 for $2,680,000. Ten thousand dollars cash and certain itemized assets of Royal #1 having an agreed value of $310,000 were to be transferred concurrently to the individual petitioners. The balance of $2,360,000 was to be paid only out of the sale of other assets of Royal #1 or out of amounts paid to Foundation by a new corporation formed to operate the business. Foundation agreed to liquidate Royal #1 forthwith and lease Royal #1's name, goodwill, real property, and all fixed assets (except those to be conveyed to the individual petitioners) to the new corporation. Foundation agreed to sell to the new corporation all of the current assets and deferred charges. The new corporation was to agree in writing to pay all obligations shown on Royal #1's closing audit and to give Foundation a 5-year, non-interest-bearing note for the difference between the book value of the assets sold to the new corporation and the obligations assumed by it in this transaction. The lease was to be executed concurrently and to become effective upon dissolution of Royal #1. Although the purchase agreement was silent on this point, it was understood that the payments under the lease would be 80 per-

cent of the new corporation's net earnings before tax. Foundation agreed to pay to the individual petitioners, to apply on the purchase price, 90 percent of all amounts received in cash under the lease until the purchase price was paid in full. The entire balance of the purchase price would become due and payable on July 31, 1963, if not paid sooner. The unpaid balance of the purchase price was to bear no interest except after maturity, and then only at an annual rate of 4 percent. If Foundation did not make payments totaling $100,000 during any calendar year, the individual petitioners could accelerate the unpaid balance of the purchase price and declare a default. If Foundation failed to cure a default, the individual petitioners could enforce payment, but only out of their collateral, i.e., security interests (deeds of trust, mortgages) in the property acquired by Foundation on liquidation of Royal #1 and other property acquired as a result of this transaction.

At the time of the transaction, both sides anticipated that the purchase price would be paid in 8 to 10 years. James would have sold Royal #1 for less in a cash sale.

Attached to the purchase agreement was a balance sheet of Royal #1 as of July 31, 1953, as follows:

ASSETS

Current assets:

| | | |
|---|---:|---:|
| Cash on hand and in bank | $514,954.92 | |
| Accounts receivable | 432,365.48 | |
| Notes receivable | 245,476.35 | |
| Inventory | 14,404.07 | |
| Deposits | 100.00 | |
| Total current assets | | $1,207,300.82 |

Investments:

| | | |
|---|---:|---:|
| Stocks | $111,162.46 | |
| Investment in Burrows Dairy (limited partnership) | 129,686.94 | |
| Investment in ice cream store | 9,204.09 | |
| Total investments | | 250,053.49 |

| Fixed assets | Cost | Reserve for depreciation | Net book value | |
|---|---:|---:|---:|---:|
| Land | $46,968.60 | | $46,968.60 | |
| Buildings | 121,343.45 | $34,582.87 | 86,760.58 | |
| Office furniture and equipment | 30,130.78 | 12,747.82 | 17,382.96 | |
| Delivery equipment | 398,088.11 | 323,932.09 | 74,156.02 | |
| Plant equipment | 207,951.76 | 108,654.35 | 99,297.41 | |
| Garage equipment | 3,302.65 | 2,658.86 | 643.79 | |
| Cans and cases | 63,540.31 | 42,671.31 | 20,869.00 | |
| Total fixed assets | | | | 346,078.36 |

Deferred charges:
Prepaid insurance_____ $4, 023. 85
Employees uniforms_____ 1, 419. 06
Prepaid equipment rental_____ 1, 550. 00
Deferred vacation expense_____ 2, 829. 54
California franchise tax refund claim_____ 4, 519. 12
Noncompetition agreement_____ 15, 895. 00
Prepaid taxes_____ 2, 555. 09

Total deferred charges_____ $32, 791. 66

Total assets_____ 1, 836, 224. 33

### LIABILITIES AND NET WORTH

Current liabilities:
Accounts payable_____ $158, 332. 38
Accrued wages payable_____ 45, 417. 44
Payroll and withholding taxes payable_____ 18, 446. 36
Employees' bonds_____ 14, 450. 80
Other accrued liabilities_____ 7, 028. 32
Federal income taxes payable (1952)_____ 51, 869. 23
Federal income taxes payable (current)_____ 97, 208. 44

Total current liabilities_____ $392, 752. 97
Contingent liabilities:
The Company is contingently liable as co-
maker on the notes of Burrows Dairy to
Security-First National Bank, Walnut Park
Branch, in the amount of_____ $138, 800. 00
The Company is also contingently liable as
guarantor on the note of Leo Snozzi to the
Security-First National Bank, Downey
Branch, in the amount of_____ 50, 000. 00

Total contingent liabilities_____ 188, 800. 00
Net worth:
Capital Stock—issued and outstanding, 9,120
shares_____ 912, 000. 00
Earned surplus—January 1,
1953_____ $431, 163. 57
Add profit to date_____ 100, 307. 79 531, 471. 36

Total net worth_____ 1, 443, 471, 36

Total liabilities and net worth_____ 1, 836, 224. 33

On July 31, 1953, at a special meeting of Royal #1's board of directors, all of the old directors and officers resigned and new directors and officers were elected. Cote became a director and president.

A resolution was adopted to immediately wind up the corporation's affairs and voluntarily distribute all of its assets in liquidation. On August 3, 1953, Royal #1 filed with the California secretary of state a certificate of election to dissolve. On August 14, 1953, Royal #1 filed with the California secretary of state a certificate of complete dissolution stating that all of its assets had been transferred to Foundation, which had assumed the payment of all obligations and liabilities.

On July 31, 1953, Foundation paid the individual petitioners a total of $10,000 as initial downpayment for the Royal #1 stock. On August 1, 1953, Foundation transferred to the individual petitioners the $310,000 of Royal #1 property noted in the sale agreement, including: Real property in Newport Beach, Calif. (deeded on August 27, 1953), a 34-foot cruiser, stock in two dairy companies and an ice cream company, a limited partnership in another dairy company, two notes in favor of Royal #1, and other items. Foundation did not want this property, since it was of no use in its running of the business heretofore carried on by Royal #1. For purposes of this transaction the property was transferred at approximately its book value.

On August 16, 1954, Royal #2, the new corporation formed to operate the business, issued for cash 1,000 shares of $10 par value, of which 10 shares each were owned by Joseph, James, and Lillian, 310 shares were held by trusts established for their minor children, and 140 shares were held by other relatives. The remaining 520 shares were owned by employees and other persons who were not relatives of the individual petitioners. The individual petitioners were advised by representatives of the Foundation that they and their relatives would not be allowed to own more than 48 percent of the issued and outstanding stock of the corporation. They did not loan or otherwise advance any money for the purchase of the remaining 520 shares.

Of the 520 shares, 20 were owned by Forest Smith and 30 by Joseph Drown (hereinafter sometimes referred to as Smith and Drown, respectively), both of whom were involved with James and Joseph in a restaurant venture known as BDS—Bahan and Drown and Smith. Smith and Drown relied upon James and Joseph for the operation of Royal #2, just as James and Joseph relied upon Smith and Drown for the operation of BDS.

On August 1, 1953, Foundation and Royal #2 entered into a 5-year lease, as described in the sales agreement. The lease provided that after Royal #2 paid a total of $2,650,000 in "rental," the rate would be reduced from 80 percent to 60 percent of the profits before Federal income and excess profits taxes, California franchise tax, and other

similar taxes based upon income. If in any calendar year Royal #2 did not pay as "rental" at least $110,000, Foundation could cancel the lease. Royal #2 was obligated to maintain the premises in a good state of repair and could make capital improvements, with the costs to be credited upon "rental," to a maximum of $5,000 in any quarter year, unless Foundation consented in writing to a greater amount. Royal #2 was to pay all property taxes; however, the tax bills were mailed to Foundation. Royal #2 was to fully insure the property. In the event of damage, the proceeds of insurance policies were to be used to restore the premises and any excess cost of restoration was to be treated as an expense of operation. Royal #2 could not assign the lease or sublet the property without Foundation's written consent. At all times during the continuance of the lease at least 60 percent of the outstanding stock of Royal #2 must be held only by such persons as Foundation approved.

James, as president of Royal #2, made no investigation of what a fair rental would be for the property subject to the lease from Foundation to Royal #2. He accepted the 80-percent figure specified in the lease because that was part of Foundation's "standard deal" and it "sounded fair" to him.

On July 31, 1953, Foundation transferred to Royal #2 current assets, subject to current liabilities, of Royal #1. Royal #2 gave in return its promissory note for $806,984.21, dated August 1, 1953, payable on or before 5 years from date without interest before maturity but with interest at 7 percent from and after maturity only. The only current asset received by Foundation in the liquidation of Royal #1 which was not transferred to Royal #2 was a California franchise tax refund claim for $4,519.12. Upon receipt of payment, Foundation paid the refund over to the individual taxpayers and applied it upon the purchase price.

As security for the unpaid balance of the purchase price, Foundation gave the individual petitioners a deed of trust and assignment and a chattel mortgage, and assigned to the individual petitioners its Royal #2 lease and the Royal #2 note.

The changeover from Royal #1 to Royal #2 was accomplished with no shutdown or disruption and with the same operating personnel. James, who had been secretary-treasurer of Royal #1, was elected president of Royal #2. Joseph, who had been president of Royal #1, was elected secretary-treasurer of Royal #2. The directors of Royal #1, prior to the sale of the stock, were the individual petitioners. The directors of Royal #2 were Joseph, James, and

Joseph F. Schneider. There were no employment contracts. James understood that if the business failed to "make a profit," Foundation could "get rid" of him. He also understood that after the purchase price had been paid, he could stay in the business only if Foundation "wanted to keep" him and if he wanted to stay.

During the period in which Foundation leased assets to Royal #2, officers of Foundation made periodic visits to the leasehold properties.

Royal #2 spent on capital improvements and credited against rents the following net amounts in each of the indicated years: 1953—$19,291.99; 1954—$76,428.99; 1955—$58,969.59; 1956—$68,676.42; 1957—$10,476.47.

Royal #2 made payments to Foundation on account of the $806,-984.21 note in the following amounts on the indicated dates: January 15, 1954—$19,984.21; November 15, 1954—$87,000; August 16, 1957—$100,000.

Between August 1, 1953, and August 16, 1957, Foundation paid to the individual petitioners, in accordance with the purchase agreement, the following total amounts out of cash "rentals," payments on the note, and proceeds from sales of assets:

| | | |
|---|---:|---:|
| Total paid to Foundation by lessee | | $1,515,336.73 |
| Retained by Foundation | $125,916.74 | |
| Paid for insurance | 24,195.00 | 150,111.74 |
| Total paid to Bahans out of receipts from lessee | | 1,365,224.99 |
| Plus: | | |
| July 31, 1953, downpayment | $10,000.00 | |
| Feb. 23, 1954, franchise tax refund | 4,519.12 | |
| Interest on refund | 234.75 | 14,753.87 |
| | | 1,379,978.86 |

On their joint 1953 Federal income tax returns, each couple reported the sale of their stock in Royal #1 as a long-term capital gain on the installment basis, with the following explanation:

| | |
|---|---:|
| Date of acquisition: 1931 | |
| Date of sale: July 31, 1953 | |
| Sales price | $1,340,000.00 |
| Cost | [4] 150,817.55 |
| Profit | [4] 1,189,182.45 |
| Percentage profit to sales price | 88.74495 |
| Downpayments plus other receipts during 1953 | 203,441.15 |
| Gain reportable on installment sale | 180,543.75 |

[4] Joseph and Lillian reported their cost as $150,817.56 and their profit as $1,189,182.44.

On their joint returns for 1954, 1955, and 1956, each couple reported long-term capital gains on the installments received during those years on the sales price of said stock, as follows:

| Year | Total receipts | Gain reportable |
|---|---|---|
| 1954 | $165,629.67 | $146,987.97 |
| 1955 | 145,525.37 | 129,146.42 |
| 1956 | [5] 148,052.93 | [5] 131,389.50 |

In the notice of deficiency, respondent treated the entire amounts received from Foundation during each of the years as ordinary income.

Royal #2 reported the following on its Federal income tax returns for the taxable years 1953, 1954, 1955, and 1956:

| Year | Deduction for rental | Taxable income | Income tax | Net after income tax |
|---|---|---|---|---|
| 1953 (5 months) | $154,434.07 | $37,064.17 | $15,627.58 | $21,436.59 |
| 1954 | 359,622.50 | 86,309.41 | 39,380.89 | 46,928.52 |
| 1955 | 403,158.92 | 97,193.50 | 45,040.62 | 52,152.88 |
| 1956 | 389,656.81 | 95,632.61 | 44,228.96 | 51,403.65 |

Respondent disallowed the claimed rental deductions because "said amounts do not constitute an ordinary and necessary business expense under the provisions of the Internal Revenue Codes, 1939 and 1954." In lieu thereof, he determined "that a reasonable allowance for the use of assets allegedly sold to University Hill Foundation for each year is as follows:

| Year | Amount |
|---|---|
| Period Aug. 1, through Dec. 31, 1953 | $15,719.12 |
| Dec. 31, 1954 | 43,414.74 |
| Dec. 31, 1955 | 52,448.13 |
| Dec. 31, 1956 | 58,203.45" |

Charles Benner (hereinafter sometimes referred to as Benner) was in charge of Royal #2's wholesale marketing in 1956 and 1957. Beginning in the latter part of 1956, customers questioned Benner with regard to Royal #2's connection with Foundation. Several of the customers indicated to Benner that they might transfer their business to a competitor if a Roman Catholic educational institution directly or indirectly owned or controlled Royal #2. At least one competitor's sales manager indicated to Benner that he used this issue to try to get customers away from Royal #2. Benner notified James of these matters. In 1957, proposition 16 appeared on the

---

[5] Joseph and Lillian reported their receipts as $148,522.92 and their gain as $131,806.59.

ballot in California providing for the withdrawal of State tax exemption from parochial and other private schools. Benner and James feared that the public controversy attending proposition 16 would cause a substantial loss of business especially public school accounts. James raised the problem with Carroll, by then the president of Foundation. Benner threatened to accept a competitor's job offer if the relationship were not severed. James suggested to Carroll that Foundation sell the creamery assets to a new corporation. Carroll consulted with Foundation's other trustees on this matter, and then with Foundation's attorneys. James, on behalf of the sellers of Royal #1 and the owners of Royal #2, and Carroll, on behalf of Foundation, then negotiated the terms and the sales price between themselves.

On July 29, 1957, Atlantic Dairy, Inc. (hereinafter sometimes referred to as Royal #3), was incorporated in California. On January 29, 1958, its legal name was changed to Royal Farms Dairy Co. On July 28, 1958, Royal #3 issued 20,000 shares of $10 par value stock for a total capital of $200,000. James and Joseph each owned 7,800 shares and the remaining shares were owned principally by employees of the corporation. James, Joseph, and Edward J. Murphy, an employee, were elected directors. James became president and Joseph became secretary-treasurer.

On July 31, 1957, Foundation entered into an agreement selling to Royal #3 all its interest in the lease to Royal #2 and all property then leased thereunder, the purchase agreement dated July 31, 1953, between Foundation and the individual petitioners, and the $806,984.21 note (then present balance $600,000) from Royal #2 to Foundation. Royal #3 agreed to pay Foundation $250,000, of which $100,000 was payable within 5 days and the balance represented by two notes for $75,000 each, with interest at the rate of 5 percent per year, payable on or before October 30, 1957, and January 30, 1958, respectively. Royal #3 also assumed all of Foundation's liabilities and obligations to the individual petitioners and to Royal #2 under the lease. Royal #3 agreed to obtain from the individual petitioners their consent to the transfers and their written agreement to release Foundation from all liability.

That agreement recited the following, among other things:

It has come to the attention of Seller [Foundation] that its affiliation with Royal Farms has been advanced by certain competitors to Royal Farms as a reason why certain customers and potential customers should not purchase dairy products from Royal Farms. Seller is informed that substantial detriment to Royal Farms has resulted in the past from such solicitation, and that the fu-

ture effect thereof may also be substantially detrimental both to Royal Farms and to Seller as its landlord.

Seller desires to disassociate itself from Royal Farms and from the business carried on by it, and to that end desires to sell its entire interest therein to Buyer upon the terms and conditions hereinafter set forth.

On March 20, 1958, after receiving payment on the second note, Foundation gave Royal #3 a deed covering the real property and a bill of sale covering the personal property listed.

On August 19, 1957, Royal #3 agreed with each Royal #2 stockholder to purchase his shares of stock for $225 per share, the price to be reduced as follows:

Should any income and/or franchise taxes, in addition to the tax shown by the income tax returns filed and to be filed, including interest and penalties, be assessed against the corporation, or against the stockholders, or any of them, arising out of the organization of or ownership of stock of Royal Farms Dairy Co., together with the cost of defending any litigation pertaining to such tax liability, shall be deducted and charged pro rata against the purchase price of the stock herein being purchased and sold. Any tax assessed to each stockholder on the gain from the sale of said stock shall not be included in the reduction of such purchase price.

That day, each Royal #2 shareholder gave Royal #3 an assignment of his stock and request to the corporation commissioner for a permit to transfer the shares held in escrow. The permit was issued on October 11, 1957.

On November 4, 1957, Royal #2 filed with the California secretary of state a certificate of election to wind up and dissolve. On December 17, 1957, it filed with the California secretary of state a certificate of winding up and dissolution stating that all of the assets has been distributed.

Pursuant to its agreement with Foundation dated July 31, 1957, Royal #3 paid to the individual petitioners amounts totaling $990,-021.14 by April 1, 1961, as follows:

| | |
|---|---|
| Joseph (or his estate) | $249,435.85 |
| Lillian | 245,097.99 |
| James | 249,916.74 |
| Mary | 245,570.56 |

Royal #3 set up its purchase of assets from Foundation on its books as follows:

| | |
|---|---|
| Notes assumed | $990,021.14 |
| Cash (down plus 2 payments) | 250,000.00 |
| Total purchase price | 1,240,021.14 |

Analysis of purchase price:

| | |
|---|---|
| Note receivable | $600, 000. 00 |
| Land | 135, 485. 22 |
| Buildings | 158, 566. 65 |
| Yard improvements | 10, 000. 00 |
| Plant equipment | 145, 547. 27 |
| Cans and cases | 10, 000. 00 |
| Delivery equipment | 175, 670. 00 |
| Office equipment | 4, 752. 00 |
| Total | 1, 240, 021. 14 |

During the period from Foundation's acquisition of the fixed assets on July 31, 1953, until their sale on July 31, 1957, the net capital additions totaled $233,843.46 while the depreciation deductions totaled $430,656.17. These assets, which had been set up on the books of Foundation at a total value of $733,943.50 on July 31, 1953, had depreciated book values at the time of their sale on July 31, 1957, as follows:

| Property | Book cost | Less depreciation | Net book value |
|---|---|---|---|
| Land | $123, 539 81 | 0 | $123. 539. 81 |
| Buildings | 148. 200. 00 | $29, 021. 22 | 119. 178. 78 |
| Plant equipment | 226. 620. 15 | 100. 198. 19 | 126. 421. 96 |
| Yard improvements | 10, 000. 00 | 5, 000. 03 | 4, 999. 97 |
| Office equipment | 17, 884 78 | 11, 031. 91 | 6, 852. 87 |
| Cans and cases | 61, 236. 53 | 27, 734. 30 | 33. 502. 23 |
| Delivery equipment | 380, 305 69 | 257, 670. 52 | 122. 635. 17 |
| Total | 967, 786. 96 | 430, 656. 17 | 537, 130. 79 |

Goodwill was listed on Foundation's books at its original cost of $824,553.17.

No formal declaration of dividends has ever been made with respect to the stock of Royal #1, #2, or #3.

The fair market value on July 31, 1953, of Royal #1 as a going business exceeded $2 million and was not substantially different from the price set in the sales agreement. The parties to the 1953 transfer of Royal #1 stock intended and expected that the sales price would be paid within 10 years, at the end of which time the individual petitioners would no longer have a security interest in the property. The parties did not intend or expect that the individual petitioners would regain a proprietary interest in the property, directly or indirectly, except as to the $310,000 transferred at the time of the sale to Foundation, the $4,519.12 California franchise tax refund, and the current assets sold to Royal #2.

The sales, gross profit from sales, rent (in the case of Royal #2 with regard to the property leased from Foundation), net income before tax, and net income after tax (in the case of Royal #1, #2, and #3) as reported by Partnership and the three Royal Farms Dairy corporations, is given by the following table for the years 1941 through 1961:

| Year | Sales | Gross profit from sales | "Rent" | Net income before tax | Net income after tax |
|---|---|---|---|---|---|
| Partnership: | | | | | |
| 1941 | $931,148.78 | $578,348.39 | | [1] $72,022.14 | |
| 1942 | 1,238,381.00 | 736,587.40 | | [1] 165,770.16 | |
| 1943 | 1,797,955.44 | 1,125,538.96 | | [1] 314,744.46 | |
| 1944 | 1,871,717.33 | 1,054,096.40 | | [1] 346,689.93 | |
| 1945 | 2,081,291.04 | 680,933.99 | | [1] 309,319.30 | |
| Royal #1: | | | | | |
| 1946 | 2,801,185.17 | 817,646.89 | | 363,063.95 | $225,106.23 |
| 1947 | 2,998,944.72 | 775,348.52 | | 222,662.46 | 139,979.73 |
| 1948 | 3,545,820.33 | 1,036,077.04 | | 363,377.20 | 227,767.47 |
| 1949 | 3,813,639.46 | 1,227,756.92 | | 337,603.58 | 212,553.51 |
| 1950 | 3,903,122.21 | 1,306,492.34 | | 273,069.23 | 163,130.15 |
| 1951 | 4,597,404.59 | 1,440,756.14 | | 268,484.78 | 137,728.75 |
| 1952 | 5,354,796.19 | 1,538,772.28 | | 259,948.23 | 130,275.15 |
| 1953 (part) | 3,147,947.21 | 945,344.50 | | 197,516.23 | 100,307.79 |
| Royal #2: | | | | | |
| 1953 (part) | 2,319,318.12 | 738,580.74 | $154,434.07 | [2] 37,064.17 | 21,436.59 |
| 1954 | 5,338,149.15 | 1,818,515.17 | 359,622.50 | [2] 86,309.41 | 46,928.52 |
| 1955 | 5,830,696.31 | 1,933,439.92 | 403,158.92 | [2] 97,193.50 | 52,152.88 |
| 1956 | 5,944,859.92 | 1,943,758.75 | 398,656.81 | [2] 95,632.61 | 51,403.65 |
| 1957 (part) | 3,926,233.02 | 1,293,659.02 | 251,176.10 | [2] 57,185.80 | 33,260.63 |
| Royal #3: | | | | | |
| 1957 (part) | 2,054,824.72 | 687,680.54 | | 162,809.04 | 83,648.34 |
| 1958 | 6,071,448.41 | 2,025,537.08 | | 374,794.53 | 186,320.54 |
| 1959 | 6,454,339.78 | 2,018,796.05 | | 328,659.81 | 176,427.06 |
| 1960 | 6,731,372.80 | 2,234,785.94 | | 420,304.95 | 208,092.45 |
| 1961 | 6,524,357.18 | 2,067,370.33 | | 337,038.01 | 183,951.20 |

[1] Amounts not reduced by salaries of James and Joseph.
[2] Royal #2 did not deduct depreciation on the assets subject to the lease.

The fair rental value of the property subject to the Foundation-Royal #2 lease was 50 percent of Royal #2's net profit before income taxes.

### OPINION

### *Issue 1—Capital Gains*

Petitioners maintain that the payments from Foundation during the years before us were received on account of the sale by them of capital assets held more than 6 months. They treat the gain as long-term capital gain, taxable on the installment method in the year received. Respondent's position is that there really was no sale within the contemplation of the Code, that the income is really current business profits and not sales proceeds.

We agree with petitioners.

Before this case was tried, similar fact patterns appeared in *Emanuel N. (Manny) Kolkey*, 27 T.C. 37 (1956), aff'd. 254 F. 2d 51 (C.A. 7, 1958); *Union Bank* v. *United States*, 285 F. 2d 126 (Ct. Cl. 1961); and *Clay B. Brown*, 37 T.C. 461 (1961), on appeal (C.A. 9,

June 25, 1962). See also *Estate of Ernest G. Howes*, 30 T.C. 909 (1958), affirmed sub nom. *Commissioner* v. *Johnson*, 267 F. 2d 382 (C.A. 1, 1959); *W. H. Truschel*, 29 T.C. 433 (1957).

Respondent equates this case to *Kolkey*, in which we held there was no sale. He maintains that *Brown*, in which we upheld the petitioners' position, was either wrongly decided or distinguishable on its facts. Respondent does not suggest what the factual distinction is between this case and *Brown*. Respondent does criticize both *Brown* and *Union Bank* for finding that there was consideration for the transfers of businesses in those two cases but otherwise suggests no specific reason to justify his request that we disagree with *Union Bank* and that we overrule *Brown*.

In *Brown*, *supra* at 487, we said that the facts in *Kolkey* differed in a number of ways, among them that the *Kolkey* sales price was almost four times the fair market value of the property and that the transaction was collapsed and the business retrieved by its "former" owner within a year after the purported sale. These factors, also stressed by this Court in *Howes*, *supra* at 925–926, indicated that the transaction was not really intended to effectuate a change in ownership. We found in *Brown* insufficient reason to disbelieve the direct evidence of intent to dispose of the ownership of the business. We agreed there with the *Union Bank* view that a transfer under these circumstances was a sale for our purposes when it involved a real change of status from owners of the business to holder of security interest and contemplated ultimate relinquishment of even the security interest within a reasonable time.

Here, the price "was within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets" (*Clay B. Brown*, *supra* at 486); [6] the payments on the purchase price were expected to be and were in fact completed (by Royal #3) within 10 years; despite the 1957 sale to Royal #3 we believe that there was no plan in 1953 to recapture the business at any time in the future; the direct testimonial evidence of intent to really transfer the ownership of the business by the 1953 sale was not so incredible as to justify our disregard of it; and the form of the transaction clearly was that of a sale. The facts in *Kolkey* differ

---

[6] Respondent's expert witness testified that Royal #1, as a going business, had a cash sale fair market value of $2,089,476.83. He also described approximately 20 methods of valuing goodwill which, when applied to Royal #1, produced values for goodwill ranging from $130,000 to $1,058,000. Respondent's witness used the figure of $325,000, an amount resulting from application of A.R.M. 34, in reaching his determination as to the fair market value of the business. Petitioners' expert witness determined that the fair market value of the assets, including goodwill, but not including the $310,000 of assets turned back to the individual petitioners on the sale, was at least $1,850,000. He pointed out, however, that a fair price for those assets would be much greater than this amount where the price was to be paid solely out of the earnings of the assets. See *M. Pauline Casey*, 38 T.C. 357, 382 (1962).

from this case in essentially the same manner in which they differed from the facts in *Brown*. See also *Howes, supra* at 925–926.

We find no substantial difference between this case and *Brown* and *Union Bank*, and none has been suggested to us. We find no reason to reexamine the view we took of the law in *Brown* and no persuasive reason for reexamination has been suggested to us.

As we noted in *Anderson Dairy, Inc.*, 39 T.C. 1027 (1963), this Court has treated this type of issue as essentially a search for the bona fides of the transaction. On the basis of our findings and in the light of our decisions on similar fact patterns, we hold that the 1953 transfer here at issue was intended to and did effect a bona fide sale or exchange within the meaning of the Code.

Respondent's suggestion, first made on reply brief, that part of the proceeds be taxable as interest income to the individual petitioners is rejected for the reasons given in *Brown, supra* at 489–490, for rejection of a similar argument made there.[7]

Respondent cites California statutes and cases from which he concludes there was no sale under the law of California, the jurisdiction within which the transfer occurred. It is not clear whether respondent intends to imply that we are bound by State labels (cf. *Brewer-Fay Investment Co.*, 39 T.C. 894 (1963)) or merely intends to bolster his argument that the transaction was not a sale under the Internal Revenue Code. The second alternative has been rejected, *supra*, and the first alternative will not survive the fact that Foundation made a $10,000 downpayment out of its own funds. That money came neither from Royal #1's assets nor from Royal #2's payments under the lease. Certainly, a payment of $10,000 in hand is sufficient consideration to support a contract in California. E.g., *Schumm* v. *Berg*, 37 Cal. 2d 174, 185, 231 P. 2d 39, 44 (1951); Restatement, Contracts, sec. 81.

In order to help us properly characterize the 1953 transaction, evidence was accepted regarding events that occurred in 1957 and thereafter. The effect of the 1957 transfer on the taxable nature of the payments in 1957 and thereafter is not before us and we express no opinion on that matter.

We hold for petitioners on this issue.

### *Issue 2—Rent*

Respondent maintains that the amounts deducted by Royal #2 as rental payments were really payments "attributable to the equity interests of the [individual petitioners] in Royal #2." Respondent

---

[7] Respondent suggests that $600,000 of the purchase price is allocable to interest, out of the total purchase price of $2,680,000. At the end of the last year before us, approximately $1,350,000 remained to be paid on the purchase price. The parties treated all the payments made during the years before us as payments on the purchase price.

argues that if we find the 1954 transfer was a sale, then these payments were simply the means for paying the individual petitioners on the purchase price of Royal #1 and had no relationship to the use of the assets subject to the lease. In that event, respondent is willing to allow deductions in accordance with what his expert witness testified was a fair rental rate—$182,975 per year.

Petitioners argue that the reasonableness of the rental is irrelevant and that the question is whether the amounts paid were "required" [8] to be paid as rent or were instead something else paid under the guise of rent. Petitioners maintain that these amounts were neither dividends nor gifts and that, therefore, we have no warrant for denying their deduction in whole or part. Petitioners aver that Foundation and Royal #2 had adverse interests in the negotiation of the lease and that Foundation insisted upon 80 percent of the profits as the rental under the lease. Petitioners maintain that, in any event, the amounts paid were reasonable in that they were paid pursuant to a formula—80 percent of profits before taxes—which would have yielded a reasonable rental as applied to the experience of Royal #1 in 1951 and 1952.

We agree with petitioner that our initial inquiry is as to the nature of the payments and not as to what would be a reasonable rent. *Stanley Imerman*, 7 T.C. 1030 (1946). To the extent indicated below, we agree with respondent that the payments were not rent.

The rental provisions of the lease were merely part of a package arrangement subordinated to the sale of Royal #1 and served primarily the purpose of providing Foundation with the funds from which it could make payment to the individual petitioners on account of the transfer of Royal #1.[9] The 80-percent figure was part of the

---

[8] SEC. 162 [I.R.C. 1954]. TRADE OR BUSINESS EXPENSES.

(a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

* * * * * * *

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

Almost identical language appeared in section 23(a)(1)(A) of the 1939 Code.

[9] "Q. Now, the rent called for 80 per cent of the net profits before taxes.
You were the president, as I understand, of the lessee corporation?
A. [James] I was.
Q. And you ran it throughout the period that it was in existence; is that correct?
A. Yes.
Q. In your opinion, was that rent fair and reasonable?
A. I think it was.
Q. Now, will you explain why you think so?
A. Well, in looking over the earnings—And to get paid out of a transaction like that you would have to make money to get your money back for the sale, and looking over the earnings and the rent—Like, if I remember right, 90 per cent of 80 per cent would be paid to the sellers and I believe 8 percent went to the Foundation. Then 20 percent went to the operating company. In looking over the profits we were making I thought it was reasonable and they could afford to pay it."

standard structure created by Foundation in its acquisitions of Royal #1 and other businesses; it did not result from negotiation, arm's-length or otherwise, *on the lease*.[10] We note that the figure was scheduled to drop to 60 percent when the rentals had reached a cumulative total of $2,650,000—an amount sufficient to enable Foundation to pay the entire purchase price.

Petitioners' reliance upon *Imerman* is misplaced. We agree with the *Imerman* view that the reasonableness of the amount is not a sufficient criterion of deductibility in rent cases, contrary to the rule in compensation cases. In *Imerman* we concluded that "except for the relationship between the lessor and the petitioners, we find nothing which might form a basis for claiming that the renewal of the lease on January 2, 1941, was not an arm's length transaction or that the payments were of any other nature or character than rents." 7 T.C. at 1038. The lease in effect during the year then before us provided for a rental of a fixed minimum amount plus a percentage of sales on a sliding scale. The Commissioner apparently did not argue that the agreement was unreasonable when entered into. In fact, during the first year of the lease the total rent was less than half the amount the Commissioner determined to be a reasonable rent for the year before us in that case.

Here the Commissioner challenges the lease from its inception, maintains that the payments were made in part at least for a purpose other than for the use of property, and that we have substantial evidence to persuade us that the lease was not the product of arm's-length negotiations between Foundation and Royal #2. Cf. *Anderson Dairy, Inc., supra*.

On the basis of the entire record in this case, but especially those parts noted above, we conclude that, to the extent the amounts paid by Royal #2 to Foundation and denominated "rents" exceeded a fair rate of rental, such amounts were not required to be paid as a condition to the continued use and occupancy of the property.

Since Foundation, the recipient of the "rents," is not before us, it is sufficient that we characterize the excess payments as to the purposes for which they were made and it is not necessary that we determine the tax character to Foundation of those payments. *Herbert Davis*,

---

[10] "Q. How did you arrive at 80 percent of the rental figure?

A. [James] That was their—foundation's—See, that is what they were making those deals with the other people, and that is the way they rent, and I accepted it. It was their standard deal, see.

Q. In other words, you accepted that as the president of the operating company?

A. Yes. I thought that was a fair deal.

Q. Without any investigation as to what fair rental would be?

A. It sounded fair to me.

Q. But you made no outside investigation?

A. No."

26 T.C. 49, 56 (1956). See *J. J. Kirk, Inc.*, 34 T.C. 130 (1960), affd. 289 F. 2d 935 (C.A. 6, 1961).

There remains to be determined what part of the rental payments were "required" to be paid, in the sense of the statute. Our inquiry is now directed to what is a reasonable rental value of the property. See, e.g., *J. J. Kirk, Inc., supra.*

Respondent maintains that, if we find the 1953 transaction to have been a bona fide sale, Royal #2 may deduct no more than a reasonable rental—$182,795 per year, the amount testified to by respondent's expert witness, Theodore Wilkes (hereinafter sometimes referred to as Wilkes).

Petitioners' expert witness, Robert M. McCune (hereinafter sometimes referred to as McCune), testified that a fair constant rental would be $305,000 per year. He testified that the 80-percent rate provided for in the lease would yield that figure when applied to the 1951 and 1952 net earnings and depreciation of Royal #1. He concluded from that that an 80-percent rental would be a reasonable percentage rental.

Substantially all the difference between the estimates arises from the following: (1) McCune included in his calculations a "fair" return on the $806,984.21 net current assets purportedly sold by Foundation to Royal #2, while Wilkes made no allowances for that item; (2) McCune allowed $120,000 for depreciation, that being the approximate average 1951–52 depreciation deduction of Royal #1, while Wilkes allowed only $52,600 for that item and gave no effect to the possibility of Foundation making capital investments in the leased the property during the term of the lease.

The parties to this lease did not purport to subject the current assets to the lease. They treated the current assets as being transferred in exchange for a non-interest-bearing note. Just as we were reluctant to find an interest income element on the sale from the individual petitioners to Foundation when they made no provision for interest, so we are reluctant to find a rental element in the transfer of current assets where the parties made no provision for rental on account of such transfer. $106,984.21 was paid on the note in 1954. Petitioners do not suggest that Foundation and Royal #2 contemplated no payments on the note during the term of the lease. Finally, the transferred current assets included approximately $432,000 of accounts receivable and $245,000 of notes receivable at book value. We have no indication as to the then current discounted value of those assets or whether such discount constituted a built-in interest factor in the $806,984.21 note.

Inclusion of depreciation in the fair rental value is merely a recognition that a lessor expects not only to receive profit on the lease but

also to recoup the value of depreciable or exhaustible assets. The depreciation allowable for tax purposes during any 1 year is not necessarily related to such recoupment. Since Royal #1's 1951 and 1952 returns (whence petitioners derived the average depreciation figure) give no indication of the method used to determine the depreciation taken thereon, we cannot say that the average depreciation taken in those 2 years would, when applied to the term of the lease, reasonably approximate a recoupment of the value of the assets used up during that period. Wilkes' depreciation figures are set forth in great detail and do not appear to have been subjected to any specific criticism by petitioners, except for the absence of recognition of the likelihood of Royal #2's future capital investments. The lease permitted Royal #2 to spend up to $5,000 per quarter on capital improvements without Foundation's approval and to credit such amounts on the "rent." The record indicates net additional investments by Foundation in the leased property averaging approximately $60,000 per year during the period of Foundation's ownership of the property. On the basis of the record as a whole, we conclude that a fair constant rental for the term of the lease would have been $200,000 per year.

It is true, as petitioners say, that the arrangement was for a percentage rental. Petitioners defend the use of 80 percent since that percentage of average 1951–52 income, when added to the average depreciation taken in those years, equals the fair rental value testified to by McCune. But those years were the second and third worst net profit years of the 1943–52 decade. We decline to accept petitioners' base period as representative of the relevant past.

Under the lease, Royal #2 was required to pay to Foundation 80 percent of its net profits. Since Royal #2 did not have a depreciable interest in the property leased to it, its net profits were not reduced by depreciation. In order to compare the basis upon which the percentage figures were to be applied under the lease on the one hand with the earnings experience of Royal #1 on the other hand, we must add back depreciation to Royal #1's net income before taxes. The average 1951–52 net income before depreciation and tax is $385,697 ($264,217 average net income plus $121,480 average depreciation). Our fair constant rental is 51.9 percent of that 1951–52 figure. The income tax returns of Partnership and Royal #1 for most of the years prior to 1951 do not clearly indicate the total amount of depreciation deducted each year. Consequently we find it difficult to make an accurate estimate of the relevant total pretax, predepreciation incomes of those years. We have indicated that the net income before taxes but after depreciation for those years is greater on the average than the corresponding figures for 1951 and 1952. It is probable, then, that the earlier figures of net income plus depreciation were also greater,

on the average, than the 1951–52 figures. On the basis of the evidence in the record we conclude that 50 percent of net profits as defined in the lease is a fair translation of the constant fair rental value that we have found.

We direct that, in the Rule 50 computation, the allowable rental deduction be determined by application of the formula specified in the lease between Foundation and Royal #2 except that 50 percent shall be substituted for 80 percent wherever the latter figure appears in that formulation.

Not every payment by a corporation is an expense of *its* business. Not every payment that is an expense of its business is ordinary or necessary. This is especially so where the corporation had no real voice in determining whether it should make the payment or whether the payment was different from what an independent entity would pay.

We conclude that, except to the extent we have found a reasonable rental exceeded the amount originally allowed by respondent as a deduction, petitioners have not shown error in respondent's determination that the amounts deducted as rent by Royal #2 do not constitute ordinary and necessary business expenses under the provisions of the 1939 or 1954 Codes. Nor has petitioner shown such excess to be otherwise deductible or excludable.

To the extent indicated above, on this issue we find for respondent.

To take account of the deficiency items not contested by the individual petitioners and our determination with regard to the corporate petitioner,

*Decisions will be entered under Rule 50.*